ACCEPTED
03-15-00077-CV
4851140
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/10/2015 4:24:18 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00077-CV

# IN THE COURT OF APPEALS FOR THE THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/10/2015 4:24:18 PM
JEFFREY D. KYLE
Clerk

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

v.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

## APPELLEES' BRIEF

**Appeal from the 98th Judicial District Court of Travis County, Texas**
Cause No. D-1-GN-14-004391

Sean E. Breen
State Bar No. 00783715
sbreen@howrybreen.com
Randy R. Howry
State Bar No. 10121690
rhowry@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
HOWRY BREEN & HERMAN, LLP
1900 Pearl Street
Austin, Texas 78705-5408
Telephone: (512) 474-7300
Facsimile: (512) 474-8557

*Attorneys for Appellees*

# TABLE OF CONTENTS

Table of Contents ............................................................................................... i

Index of Authorities ........................................................................................ iii

Statement of the Case ........................................................................................1

Statement Regarding Oral Argument ................................................................2

Issue Presented ..................................................................................................3

Statement of Facts .............................................................................................4

    I.    The Contract's liquidated-damages clause and its terms............................5

    II.   Mr. Wickline leaves OSU to accept the position of "offensive coordinator" at UT ........................................................................................8

    III.  Shawn Watson, not Mr. Wickline, is calling offensive plays for UT's football team...............................................................................9

    IV.  In response to OSU's lawsuit in Oklahoma to collect the liquidated damages owed by Mr. Wickline, he filed a dueling lawsuit in Texas............................................................................................10

Summary of Argument ....................................................................................12

Arguments and Authorities .............................................................................14

    I.    Standard of Review ................................................................................14

    II.   The scope of the Contract's forum-selection clause is broad. ...................15

        A.   The Contract's forum-selection clause encompasses "any civil proceeding that gives force or effect to or carries out the clauses of the Contract"................................................................16

        B.   Mr. Wickline offers no assistance in construing the forum-selection clause.............................................................................18

    III.  Both of Mr. Wickline's claims in the second-filed Texas lawsuit fall within the scope of the Contract's forum-selection clause..............................................................................................................20

        A.   Declaratory relief.............................................................................20

        B.   Tortious interference with contract .................................................21

Prayer ..............................................................................................................27

Certificate of Compliance ...............................................................................29

Certificate of Service ...................................................................................30

# INDEX OF AUTHORITIES

**Texas Cases**

*Accelerated Christian Educ., Inc. v. Oracle Corp.*, 925 S.W.2d 66
(Tex. App.—Dallas 1996, no writ) ...................................................................22

*Barnette v. United Research Co.*, 823 S.W.2d 368 (Tex. App.—Dallas
1991, writ denied) ...........................................................................................22

*Deep Water Slender Wells v. Shell Int'l Exploration & Prod., Inc.*,
234 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2007, pet.
denied) .............................................................................................................15

*In re ADM Investor Servs., Inc.*, 304 S.W.3d 371 (Tex. 2010) ............................14

*In re AIU Ins. Co.*, 148 S.W.3d 109 (Tex. 2004)................................................22

*In re Counsel Fin. Servs. L.L.C.*, No. 13-12-00151-CV, 2013 Tex.
App. LEXIS 9255 (Tex. App.—Corpus Christi July 25, 2013, pet.
denied) ....................................................................................................... 15, 24

*In re Emex Holdings L.L.C.*, No. 13-11-00145-CV, 2013 Tex. App.
LEXIS 4802 (Tex. App.—Corpus Christi Apr. 18, 2013, orig.
proceeding)......................................................................................................15

*In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672 (Tex. 2009) ...................... 16, 19, 22

*In re Laibe Corp.*, 307 S.W.3d 314 (Tex. 2010) .......................................................14

*In re Lehman Bros. Merch. Banking Partners IV L.P.*, 293 S.W.3d
349 (Tex. App.—Dallas 2009, no pet.)............................................................16

*KTRK TV, Inc. v. Fowkes*, 981 S.W.2d 779 (Tex. App.—Houston [1st
Dist.] 1998, pet. denied)..................................................................................23

*Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d
605 (Tex. App—Houston [1st Dist.] 2005, no pet.) ................................ 15, 16, 17

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74
(Tex. 2000)......................................................................................................24

*RSR Corp. v. Siegmund*, 309 S.W.3d 686 (Tex. App.—Dallas 2010,
no pet.) ............................................................................................................16

*Sw. Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322 (Tex.
App.—Austin 1999, pet. denied) .....................................................................15

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005)...........................16

*Young v. Valt.X Holdings, Inc.*, 336 S.W.3d 258 (Tex. App.—Austin 2010, pet. dism'd) ...................................................................................... 14, 15


**Federal Cases**

*Aerus LLC v. Pro Team, Inc.*, No. 3:04-CV-1985-M, 2005 U.S. Dist. LEXIS 8559 (N.D. Tex. May 9, 2005) ...................................................................25

*Daniels v. Dataworkforce, LP*, No. 14-cv-00822-KMT, 2014 U.S. Dist. LEXIS 164363 (D. Colo. Nov. 24, 2014) ...................................................19

*Excentus Corp. v. Giant Eagle, Inc.*, No. 3:11-CV-3331-B, 2012 U.S. Dist. LEXIS 91250 (N.D. Tex. July 2, 2012) ................................................ 24, 27

*Penn, L.L.C. v. New Edge Network, Inc.*, No. 03 C 5496, 2003 U.S. Dist. LEXIS 17664 (N.D. Ill. Oct. 1, 2003)................................................ 25, 26

*Perry v. Nat'l City Mortg, Inc.*, No. 05-cv-891-DRH, 2006 U.S. Dist. LEXIS 62419, at *13–14 (S.D. Ill. Aug. 15, 2006)................................................19

*Terraspan, LLC v. Rave, LLC*, No. 3:12-CV-0816-K, 2012 U.S. Dist. LEXIS 174672 (N.D. Tex. Dec. 10, 2012) .........................................................24

*Yates v. Fleetwood Transp. Servs., Inc.*, No. 07-0960, 2007 U.S. Dist. LEXIS 79497 (W.D. La. Oct. 26, 2007)................................................19


**Texas Statutes**

Tex. Civ. Prac. & Rem. Code § 37.003 .......................................................... 20, 21

Tex. Civ. Prac. & Rem. Code § 37.004 ...............................................................21


**Treatises**

Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* (2d ed. 1899) .......................................................................................18


**Other Authorities**

BLACK'S LAW DICTIONARY (8th ed. 2004) ......................................................... 17, 18

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ..........................17

## STATEMENT OF THE CASE

Defendant – Appellee Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University (OSU), filed suit in the District Court of Payne County, Oklahoma, on October 17, 2014, to enforce its contractual right to liquidated damages against Plaintiff – Appellant Gregory Joe Wickline. Three days later, Mr. Wickline filed a second suit regarding the same nucleus of issues in the 98th District Court of Travis County, Texas, against OSU and Defendant – Appellee James Michael Holder, individually and in his official capacity as Vice President for Athletic Programs and Director of Intercollegiate Athletics for OSU.

On November 17, 2014, subject to their special appearances, OSU and Mr. Holder moved to dismiss Mr. Wickline's second-filed Texas lawsuit on two independent grounds: (i) based on a mandatory forum-selection clause in the employment contract between OSU and Mr. Wickline; and (ii) based on comity, in deference to the first-filed Oklahoma lawsuit. On January 23, 2015, Judge Amy Clark Meachum granted OSU and Mr. Holder's motion to dismiss based on the employment contract's mandatory forum-selection clause and dismissed the second-filed Texas lawsuit without prejudice to refiling in the District Court of Payne County, Oklahoma. This appeal by Mr. Wickline followed. Litigation is proceeding in the first-filed suit in Oklahoma.

- 1 -

## STATEMENT REGARDING ORAL ARGUMENT

OSU and Mr. Holder agree with Mr. Wickline that oral argument is not necessary for this case.  It presents no new or novel issues, and may be decided under clear Texas law.

# ISSUE PRESENTED

Mr. Wickline's employment contract with OSU contains a mandatory forum-selection clause that requires any civil proceeding that gives force or effect to or carries out the clauses of that contract to be filed in the Payne County District Court of Payne County, Oklahoma.

Mr. Wickline filed a civil proceeding in Travis County, Texas, for declaratory judgment and tortious interference with existing contractual relations, which:

(i)     seeks to give force or effect to the OSU contract's first amendment, by excusing Mr. Wickline's required payment of liquidated damages; and

(ii)    requires the district court to give force or effect to that same first amendment because OSU and Mr. Holder have raised their contractual right to request liquidated damages as an affirmative defense to allegedly tortious conduct.

*Did the trial court correctly conclude the employment contract's mandatory forum-selection clause applies to the claims asserted in Mr. Wickline's second-filed Texas lawsuit?*

OSU recruited Mr. Wickline to join its football coaching staff as the team's offensive line coach in 2005.[1] He signed a multi-year employment contract with OSU on January 1, 2009, which was later amended on January 1, 2011, and January 1, 2012 (the Contract).[2] In the Contract and its amendments, both OSU and Mr. Wickline inserted provisions to protect themselves if certain circumstances arose.[3] For example, because Mr. Wickline's importance to the football team and OSU was valuable and difficult to calculate, the Contract was intended to protect OSU in the event Mr. Wickline left before the Contract expired.[4] The following three provisions of the Contract are central to this appeal:

(i) a liquidated-damages clause to compensate OSU if Mr. Wickline terminated the Contract without cause before it expired on its own terms;[5]

(ii) a provision within the Contract's first amendment that would permit Mr. Wickline to avoid the liquidated-damages clause if he terminated the Contract without cause to assume employment as, among other things, "an Offensive Coordinator (with play calling duties) at a NCAA Division I-A institution";[6] and

---

[1] *See, e.g.*, CR 80.

[2] *See, e.g.*, CR 23–36.

[3] *See* CR 80.

[4] *See, e.g.*, CR 29, 80.

[5] CR 29.

[6] *See* CR 30, 34.

(iii) a mandatory forum-selection clause that selected the Payne County District Court of Payne County, Oklahoma, as the exclusive venue for "[a]ny action to enforce any of the provisions of" the Contract.[7]

## I.    The Contract's liquidated-damages clause and its terms.

The parties agreed upon and contracted for liquidated damages in the event the Contract was terminated before it expired on its own terms,[8] because, as the Contract explains, Mr. Wickline has "special, exceptional, and unique knowledge, skill, and ability as a football coach which . . . render [his] services unique."[9] OSU's loss of Mr. Wickline's services before the Contract expired "[could] not be estimated with certainty, or fairly or adequately compensated by money damages." [10] Replacing Mr. Wickline would affect OSU in many ways:

- the valuable relationships he developed while recruiting players to join OSU's football team would be impacted, particularly if he left OSU to join a competing member institution of the Big Twelve Conference, where his recruiting relationships could be used for the benefit of a direct competitor recruiting from the same geographic region as OSU;[11]

- his coaching and development of current players would be adversely affected;[12]

---

[7] CR 31.

[8] *See* CR 28–30.

[9] CR 29.

[10] CR 29.

[11] *See* CR 81.

[12] *See* CR 81.

- it would take time and resources to recruit, hire, and train Mr. Wickline's replacement;[13] and

- his knowledge of OSU's offensive schemes and tendencies could be reported to OSU's direct conference competition to be used against OSU.[14]

Many, if not most, of these consequences cannot accurately be measured in dollars.[15]

The Contract initially provided that if Mr. Wickline left OSU for any reason—other than to become the head football coach at an NCAA Division I-A institution—he would owe OSU as liquidated damages 50% of the remaining salary he was due under the Contract on the date of termination.[16] The Contract's liquidated-damages clause runs both ways: if OSU terminated the Contract without cause, it would become obligated to pay Mr. Wickline his salary for the remainder of the Contract.[17]

The head-coach exemption, and other exemptions discussed below, were intended to remove disincentives for Mr. Wickline to climb the football-coaching ladder and allow him to pursue positions with more responsibility with other teams.[18] Such clauses are not uncommon for assistant football coaches, and this one permitted Mr. Wickline to seek advancement elsewhere while still protecting OSU from early

---

[13] *See* CR 81.

[14] *See* CR 81.

[15] *See* CR 81.

[16] *See* CR 29–30.

[17] *See* CR 28–30.

[18] *See* CR 30, 82.

contract termination if Mr. Wickline attempted to make a lateral move to accept a similar assistant coaching job at another school.[19]

The liquidated-damages provisions were later amended in two important respects.[20] First, two additional categories of jobs were added for which Mr. Wickline would not owe liquidated damages if he left OSU early: (i) offensive coordinator (with play calling duties) at an NCAA Division I-A institution or (ii) assistant coach in the National Football League.[21]

Second, subject to the job-category exemptions explained earlier, the amount of liquidated damages was increased to 100% of Mr. Wickline's remaining salary on the date of termination if he accepted employment with another member institution of the Big Twelve Conference.[22] As discussed above, the harm caused if Mr. Wickline left OSU to accept employment with a direct conference competitor would be greater than if he left to join other schools.[23] Among other things, he would be utilizing recruiting relationships he developed at OSU for the benefit of a direct regional competitor, and would be providing knowledge of OSU's offensive schemes to an opponent it played every year.[24]

---

[19] *See* CR 82.

[20] CR 34–36.

[21] *See* CR 34.

[22] *See* CR 36.

[23] *See* CR 82.

[24] *See* CR 82–83.

**II. Mr. Wickline leaves OSU to accept the position of "offensive coordinator" at UT.**

On or about January 12, 2014, Mr. Wickline unilaterally terminated the Contract and was hired as the offensive line coach and nominal "offensive coordinator" for the University of Texas (UT) football team by UT's new head football coach, Charlie Strong.[25] (Mr. Strong had recently been hired by UT after spending the previous four years as the head football coach for the University of Louisville.[26]) Mr. Wickline and Mr. Strong had previously worked together, most recently when Mr. Wickline served on the football coaching staff at the University of Florida.[27]

At the time, Mr. Wickline represented to OSU his new title at UT would be "offensive coordinator" and that he would have "play calling duties," thereby allegedly excusing his payment of liquidated damages under the first amendment to the Contract.[28] Based on Mr. Wickline's representations, OSU did not attempt to enforce the Contract's liquidated-damages clause when he left in January 2014.[29] Later, OSU discovered those representations were untrue.[30]

---

[25] *See* CR 83

[26] *See* CR 83.

[27] *See* CR 83.

[28] *See* CR 30, 34, 83.

[29] *See* CR 83.

[30] *See* CR 83, 117–19.

### III. Shawn Watson, not Mr. Wickline, is calling offensive plays for UT's football team.

At or near the same time UT hired Mr. Wickline, Shawn Watson was also hired as "assistant head coach for offense."[31] Immediately before joining UT, Mr. Watson served as the offensive coordinator for Mr. Strong at the University of Louisville, where Mr. Watson called offensive plays.[32] During spring football practices a few months after Mr. Watson and Mr. Wickline were hired, Mr. Strong was quoted as saying: (i) Mr. Watson is "gonna be in charge" of play calling, to CBS Sports reporter Jeremy Fowler;[33] and (ii) in terms of play-calling, "[t]he one final voice will be Shawn," to ESPN reporter Max Olson.[34] A number of things became clear after Mr. Strong's comments to the media: Mr. Wickline was UT's "offensive coordinator" in name only, he would not have play-calling duties, and his new title was likely an attempt to avoid the Contract's liquidated-damages clause.[35] Thus, Mr. Wickline made a lateral move to work for UT and is not excused from the liquidated-damages provision of his OSU contract.[36]

---

[31] *See* CR 83, 117, 119.

[32] *See* CR 83, 117, 119.

[33] *See* CR 83–84, 117.

[34] *See* CR 84, 119.

[35] *See* CR 84.

[36] *See* CR 29–30, 34.

After Mr. Strong publicly confirmed the true nature of Mr. Wickline's new position with UT, Defendant – Appellee Mike Holder, in his official capacity as Vice President for Athletic Programs and Director of Intercollegiate Athletics for OSU, sent Mr. Wickline a letter on March 24, 2014, as required by the OSU contract.[37] The letter informed Mr. Wickline his new position at UT did not exempt him from payment of liquidated damages under the Contract and requested payment of the liquidated damages described by Section 11 of the Contract.[38]

## IV.   In response to OSU's lawsuit in Oklahoma to collect the liquidated damages owed by Mr. Wickline, he filed a dueling lawsuit in Texas.

As required by Section 14 of the Contract, OSU sent a second letter to Mr. Wickline on April 22, 2014, which gave him 30 days' notice of OSU's intent to file a lawsuit to enforce the Contract's liquidated-damages clause.[39]   After months of waiting for Mr. Wickline to comply with the Contract's obligations, OSU filed suit in the Payne County District Court on October 17, 2014 (the Oklahoma lawsuit).[40]

Instead of proceeding in Oklahoma—as required by the Contract and where a lawsuit was already pending—Mr. Wickline filed this second lawsuit three days later, on October 20, 2014 (the Texas lawsuit).[41]   In the second-filed Texas suit, he

---

[37] *See* CR 84, 120–21.

[38] *See* CR 120–21.

[39] *See* CR 31, 123.

[40] *See* CR 84, 124–27.

[41] *See* CR 3–9.

asserted two claims, both of which will or could be resolved by the Oklahoma lawsuit: (1) a defensive request for declaratory relief against OSU to construe and interpret the phrase "Offensive Coordinator (with play calling duties)" from the Contract so that he can avoid the Contract's liquidated-damages provision; and (2) tortious interference with existing contractual relations against both OSU and Mr. Holder, based on their alleged interference with his new UT contract by sending the demand letters required by the Contract.[42]

---

[42] CR 7–8.

## SUMMARY OF ARGUMENT

The trial court did not abuse its discretion and correctly granted the motion to dismiss because Mr. Wickline's claims in this second-filed lawsuit are a transparent attempt to avoid litigation in the contractually agreed-upon forum of Stillwater, Oklahoma (the home and designated situs of his former employer, OSU) in lieu of a suit in Austin, Texas (the home of his new employer, UT). In addition to a request to interpret the very contract containing the forum-selection clause at issue, Mr. Wickline has asserted a frivolous tort claim in an attempt to avoid the clause's application, all to no avail.

The Contract's forum-selection clause applies to any civil proceeding that gives force or effect to or carries out the clauses of the Contract. Mr. Wickline has not presented, and cannot present, authority to the contrary.

Without question, a declaratory-judgment claim to interpret a phrase within the Contract's first amendment is an attempt to give force or effect to a clause of the Contract. And in response to Mr. Wickline's claim for tortious interference with existing contractual relations, OSU and Mr. Holder have raised as an affirmative defense their contractual right to enforce the Contract's liquidated-damages clause. Under the plain language of the Contract's forum-selection clause, and caselaw interpreting similar situations, Mr. Wickline's tortious-interference claim falls within the scope of that clause.

Therefore, this Court should affirm the district court's dismissal without prejudice of Mr. Wickline's claims in the Texas lawsuit.

## ARGUMENTS AND AUTHORITIES

### I.     Standard of Review.

Forum-selection clauses are "generally enforceable and presumptively valid."[43]   The evaluation of a forum-selection clause involves two steps: first, whether the parties have already agreed to litigate the claims at issue in a particular forum, and second, whether enforcement of the clause would be unreasonable or unjust under the circumstances.[44]

Mr. Wickline concedes enforcement of the Contract's forum-selection clause would not be unreasonable or unjust.  As alluded to in his brief, the only dispute in this appeal is whether the Contract's forum-selection clause applies to Mr. Wickline's claims in the second-filed Texas lawsuit.[45]  OSU and Mr. Holder, as the parties seeking to enforce the Contract's forum-selection clause, bear the burden of demonstrating the nonmovant's claims fall within the clause.[46]

A trial court's order granting a motion to dismiss based on a forum-selection clause is only reversed for an abuse of discretion.[47]

---

[43] *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010).

[44] *See Young v. Valt.X Holdings, Inc.*, 336 S.W.3d 258, 262 (Tex. App.—Austin 2010, pet. dism'd).

[45] Appellant's brief, at 5.

[46] *Young*, 336 S.W.3d at 262.

[47] *See In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 375 (Tex. 2010).

## II. The scope of the Contract's forum-selection clause is broad.

The starting point for Texas courts in analyzing a forum-selection clause is a focus on the specific language of the clause at issue.[48] An image of the Contract's forum-selection clause, located in Paragraph 14, is pasted below:

> to cover Coach in the use and operation of said vehicle, during the term of this Contract.
>
>   14.  Any action to enforce any of the provisions of this Agreement shall be filed in the Payne County District Court. No such action may be filed until the party claiming to be aggrieved shall first have delivered to the other a written notice of intention to file suit, including an outline of complaints.

The phrase "shall be filed" makes the clause mandatory under Texas law, meaning it must be enforced if triggered by Mr. Wickline's claims.[49]

In determining the scope of a forum-selection clause, Texas courts apply principles of contract interpretation, with the primary objective being to ascertain and give effect to the parties' intentions.[50] That means, unless the contract shows otherwise, terms will be given their "plain, ordinary, and generally accepted

---

[48] *See Deep Water Slender Wells v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 688 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also In re Counsel Fin. Servs. L.L.C.*, No. 13-12-00151-CV, 2013 Tex. App. LEXIS 9255, at *15 (Tex. App.—Corpus Christi July 25, 2013, pet. denied); *In re Emex Holdings L.L.C.*, No. 13-11-00145-CV, 2013 Tex. App. LEXIS 4802, at *14 (Tex. App.—Corpus Christi Apr. 18, 2013, orig. proceeding).

[49] *See Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 615 (Tex. App—Houston [1st Dist.] 2005, no pet.) ("The use of 'shall' generally indicates a mandatory requirement.").

[50] *Young*, 336 S.W.3d at 262 (citing *Sw. Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322, 324-25 (Tex. App.—Austin 1999, pet. denied)).

meaning."[51]   In other words, the court engages in a "common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims."[52]

As Mr. Wickline's brief acknowledges, there are no Texas cases interpreting a forum-selection clause that applies to "actions to enforce" contractual provisions.[53] When presented with an absence of caselaw on the meaning of a particular forum-selection clause, Texas appellate courts commonly turn to dictionaries and other references to discern the parties' intent.[54]

## A. The Contract's forum-selection clause encompasses "any civil proceeding that gives force or effect to or carries out the clauses of the Contract."

The phrase requiring interpretation is "any action to enforce any of the provisions of this Agreement," which can be broken into three parts: (1) "any action," (2) "to enforce," and (3) "any of the provisions of this Agreement." The table below combines definitions from Black's Law Dictionary and Merriam-

---

[51] *See RSR Corp. v. Siegmund*, 309 S.W.3d 686, 700 (Tex. App.—Dallas 2010, no pet.) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)).

[52] *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009).

[53] Appellant's brief, at 7.

[54] *See, e.g.*, *RSR Corp.*, 309 S.W.3d at 700 (consulting Webster's Third New International Dictionary and Black's Law Dictionary to interpret the word "hereunder"); *In re Lehman Bros. Merch. Banking Partners IV L.P.*, 293 S.W.3d 349, 352 (Tex. App.—Dallas 2009, no pet.) (consulting Webster's Third New International Dictionary on the meaning of "control"); *Phoenix Network*, 177 S.W.3d at 619 n.16 (consulting Random House Webster's on the meaning of "United Kingdom").

Webster's Collegiate Dictionary into a reasoned construction of the parties' intended meaning:

| "Any action" | Black's Law Dictionary: "a civil or criminal judicial proceeding."[55] |
|---|---|
| + | + |
| "To enforce" | Black's: "to give force or effect to" or "to compel obedience to."[56]<br><br>Merriam-Webster: "to give force to" or "to carry out effectively."[57] |
| + | + |
| "Any of the provisions of this Agreement." | Black's: "a clause in a statute, contract, or other legal instrument."[58] |
| = | = |
| **Parties' Intended Meaning** | **"Any civil proceeding that gives force or effect to or carries out the clauses of the Contract."** |

Mr. Wickline argues OSU and Mr. Holder have conflated the claims asserted by Mr. Wickline with the affirmative defenses asserted by OSU and Mr. Holder.[59] But as Mr. Wickline himself is careful to point out in his brief,[60] courts may not rewrite contracts; they must "striv[e] to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative."[61] A critical piece of the Contract's

---

[55] BLACK'S LAW DICTIONARY 31 (8th ed. 2004).

[56] BLACK'S LAW DICTIONARY 569 (8th ed. 2004).

[57] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 413 (11th ed. 2003).

[58] BLACK'S LAW DICTIONARY 1262 (8th ed. 2004).

[59] Appellant's brief, at 11.

[60] *See, e.g.*, Appellant's brief, at 6, 12, 18.

[61] *Phoenix Network*, 177 S.W.3d at 615.

forum-selection clause is the word "action": the parties could have selected the word "claim" or the phrase "cause of action," but did not.  As Black's Law Dictionary confirms, "action" refers to an entire lawsuit, not any individual claim or defense: "[t]he terms 'action' and 'suit' are nearly if not quite synonymous."[62]  Thus, the Contract's forum-selection clause is broad indeed, Mr. Wickline's declarations notwithstanding.

An analysis of the "plain, ordinary, and generally accepted meaning" of the Contract's forum-selection clause shows OSU and Mr. Wickline intended that any civil proceeding in which the Contract's clauses are being given force or effect or are being carried out must be filed in Payne County, Oklahoma.

### B.     Mr. Wickline offers no assistance in construing the forum-selection clause.

It bears noting that, once again, Mr. Wickline has failed to offer an interpretation of the phrase "any action to enforce any of the provisions of this Agreement."  Instead, exactly as he did in the trial court, Mr. Wickline chose simply to declare "the language of that clause is specific and narrow,"[63] without authority or support.  Mr. Wickline's strategy of simply contrasting the word "enforce" with the words "arising out of" or "relating to"[64] provides no assistance to this Court in

---

[62] BLACK'S LAW DICTIONARY 1262 (8th ed. 2004) (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3 (2d ed. 1899)).

[63] Appellant's brief, at 5.

[64] *See, e.g.*, Appellant's brief, at 3, 6, 7.

its task of determining the parties' intent; it certainly is not a "common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims."[65]

The cases Mr. Wickline cites are equally unhelpful. In an attempt to show how federal district courts from Colorado and Louisiana interpret "enforce" clauses, Mr. Wickline cited *Daniels v. Dataworkforce* and *Yates v. Fleetwood Transportation Services*.[66] But the courts in those cases correctly declined to enforce the forum-selection clauses because the plaintiffs in each case were attempting to "enforce" rights derived by statute, not rights granted by the contract containing the forum-selection clause.[67] Even less helpful is *Perry v. National City Mortgage*, where the forum-selection clause at issue does not even contain the word "enforce."[68]

In the absence of Texas caselaw interpreting "any action to enforce," and with a directive from Texas courts to use dictionaries and other reference materials to discern the intent of contracting parties, OSU and Mr. Holder's construction of the

---

[65] *See Int'l Profit Assocs.*, 274 S.W.3d at 677.

[66] *See* Appellant's brief, at 7, 8 (citing *Daniels v. Dataworkforce, LP*, No. 14-cv-00822-KMT, 2014 U.S. Dist. LEXIS 164363 (D. Colo. Nov. 24, 2014) and *Yates v. Fleetwood Transp. Servs., Inc.*, No. 07-0960, 2007 U.S. Dist. LEXIS 79497 (W.D. La. Oct. 26, 2007)).

[67] *See Daniels*, 2014 U.S. Dist. LEXIS 164363, at *1–3; *Yates*, 2007 U.S. Dist. LEXIS 79497, at *17–18.

[68] *See Perry v. Nat'l City Mortg, Inc.*, No. 05-cv-891-DRH, 2006 U.S. Dist. LEXIS 62419, at *13–14 (S.D. Ill. Aug. 15, 2006).

Contract's forum-selection clause is the only practical solution that was presented to the trial court or in this appeal.

## III. Both of Mr. Wickline's claims in the second-filed Texas lawsuit fall within the scope of the Contract's forum-selection clause.

With OSU and Mr. Holder's common-sense and reasoned construction in mind—"any civil proceeding that gives force or effect to or carries out the clauses of the Contract"—it is plain both of the claims in Mr. Wickline's live pleading fall within the scope of the Contract's forum-selection clause. The second-filed Texas lawsuit is clearly a "civil proceeding"; the only question remaining is whether the claims and defenses within that civil proceeding ask the court or jury to give force or effect to or carry out clauses of the Contract.

### A. Declaratory relief

Chapter 37 of the Texas Civil Practice & Remedies Code permits a court to declare the rights, status, and other legal relations of parties to a contract.[69] In his first amended petition, Mr. Wickline sought a declaratory judgment under Chapter 37 to construe the phrase "Offensive Coordinator (with play calling duties),"[70] which is located in the Contract's first amendment.[71] Section 37.004(a) allows any person

---

[69] *See* Tex. Civ. Prac. & Rem. Code § 37.003(a).

[70] CR 191–92.

[71] *See* CR 34.

interested in a written contract to obtain a declaration of their rights.[72]  Section 37.003(b) states a declaration issued under Chapter 37 "has the force and effect of a final judgment or decree."[73]

Under the plain language of Chapter 37, Mr. Wickline is seeking, within a civil proceeding, to give force or effect to a provision of the Contract.  Mr. Wickline's declaratory judgment claim therefore falls within the scope of the Contract's forum-selection clause, and the trial court did not abuse its discretion when it properly dismissed that claim.

## B.    Tortious interference with contract

Mr. Wickline, as he did in the trial court, makes much of his "tortious-interference" claim in an attempt to avoid the clear effect of the Contract's forum-selection clause.[74]  But as the trial court properly recognized, that clause applies to and requires dismissal of Mr. Wickline's tortious-interference claim for at least two reasons.

First, contrary to Wickline's argument in the trial court and now on appeal, the mere fact that he plead a tort claim does not insulate him from the forum-selection clause to which he agreed.  Courts have recognized the attempt or tendency

---

[72] Tex. Civ. Prac. & Rem. Code § 37.004(a).

[73] Tex. Civ. Prac. & Rem. Code § 37.003(b).

[74] *See, e.g.*, Appellant's brief, at 9–10.

for plaintiffs to try and transform a contractual dispute into a tort in hopes of avoiding a forum-selection clause.[75] When presented with such "artful pleading," the Texas Supreme Court has rejected it, advising lower courts to forgo "slavish adherence to the contract/tort distinction."[76] Instead, a "common-sense examination of the substance of the claims made," rather than simply the title of a claim, must determine the applicability of a forum-selection clause.[77]

Here, a common-sense examination of the substance of the tortious interference claim shows the forum-selection clause squarely applies to it, notwithstanding the fact that there is no legally cognizable claim anyway. In an argument long on exaggeration and entirely devoid of facts, Mr. Wickline asserts his tortious-interference claim is premised on "a campaign of harassment [by OSU and Mr. Holder] to bully Coach Wickline—or his new employer—into paying nearly $600,000 in liquidated damages."[78] (An example of this alleged "campaign of harassment," a cordial letter from Mr. Holder on March 24, 2014, is included in the

---

[75] *Barnette v. United Research Co.*, 823 S.W.2d 368, 370 (Tex. App.—Dallas 1991, writ denied) (appellate court rejected plaintiff's argument that noncontractual theories fell outside the forum-selection clause because the claims "ar[o]se out of the contractual relation and implicate the contract's terms"); *Accelerated Christian Educ., Inc. v. Oracle Corp.*, 925 S.W.2d 66, 72–73 (Tex. App.—Dallas 1996, no writ), *overruled in part on other grounds by In re AIU Ins. Co.*, 148 S.W.3d 109 (Tex. 2004) (same).

[76] *See Int'l Profit Assocs.*, 274 S.W.3d at 677.

[77] *Int'l Profit Assocs.*, 274 S.W.3d at 677–78.

[78] Appellant's Brief, at 2.

appellate record for this Court's review.[79]) In other words, Mr. Wickline alleges OSU and Mr. Holder's two letters requesting compliance with the Contract's liquidated-damages clause constitute a tort.

In the trial court and now on appeal, Mr. Wickline offered no authority or explanation for how those actions could possibly constitute a tort, particularly when the contract he signed explicitly called for either party to send written notice of a claim and the basis for it before filing a lawsuit against the other, the express purpose of the letters at issue. Further, under Texas law, Mr. Wickline has suffered no harm as a matter of law because he is still employed by UT.[80] Even a cursory examination shows Mr. Wickline's tort allegations are baseless and, moreover, a transparent attempt to avoid the Contract's forum-selection clause.

OSU and Mr. Holder's attempts to give force or effect to the Contract's liquidated-damages clause are the source of Mr. Wickline's breach-of-contract claim, which Mr. Wickline simply attempts to disguise as a tort claim. The trial court correctly recognized such and did not abuse its discretion in dismissing the claim.

Second, even if the lack of substance of Mr. Wickline's tortious-interference claim is ignored, his assertion that the Defendants' conduct relating to the OSU

---

[79] CR 121–22.

[80] *See KTRK TV, Inc. v. Fowkes*, 981 S.W.2d 779, 791 (Tex. App.—Houston [1st Dist.] 1998, pet. denied), *disapproved on other grounds*, *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex. 2000).

contract was tortious interference and OSU and Mr. Holder's defenses to that alleged tortious conduct necessarily involve the OSU contract and make the Texas lawsuit "a civil proceeding that gives force or effect to a clause of the Contract." Privilege and justification are affirmative defenses to tortious interference with contract under Texas law.[81] In their pleadings, both OSU and Mr. Holder asserted their allegedly tortious actions (requesting payment of $593,000 from Mr. Wickline) were privileged or justified because they were the exercise of OSU and Mr. Holder's own contractual rights (to liquidated damages under Section 11 of the Contract).[82] OSU and Mr. Holder's privilege/justification defense, based on Section 11 of the Contract, makes the Texas lawsuit a "civil proceeding that gives force or effect to or carries out a clause of the Contract"; therefore, the Contract's forum-selection clause is triggered.

This is not a novel concept: multiple courts have held a contract's forum-selection clause is triggered if the scope of the clause covers lawsuits involving a defense found within the contract containing the clause.[83] In fact, a federal court in

---

[81] *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 81 (Tex. 2000) ("Generally, justification is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights.").

[82] *See, e.g.*, CR 17, 44.

[83] *See Counsel Fin. Servs. L.L.C.*, 2013 Tex. App. LEXIS 9255, at *17–18; *Terraspan, LLC v. Rave, LLC*, No. 3:12-CV-0816-K, 2012 U.S. Dist. LEXIS 174672, at *8–10 (N.D. Tex. Dec. 10, 2012); *Excentus Corp. v. Giant Eagle, Inc.*, No. 3:11-CV-3331-B, 2012 U.S. Dist. LEXIS 91250, at *15–16 (N.D. Tex. July 2, 2012); *Aerus LLC v. Pro Team, Inc.*, No. 3:04-CV-1985-M, 2005

the Northern District of Illinois enforced a forum-selection clause under facts nearly identical to this case. In *Penn L.L.C. v. New Edge Network*, New Edge provided internet-access services to Penn under a services agreement.[84] That services agreement, which permitted New Edge to unilaterally halt Penn's internet access if Penn violated usage terms, contained a forum-selection clause that required "any action or suit to enforce any right or remedy of this agreement" to be filed in Washington state.[85] (Note actual use of the word "enforce.")

When New Edge interrupted Penn's internet access for alleged usage violations, Penn filed fraud and tortious-interference claims in Illinois state court.[86] (Just as in this case, Penn's tortious-interference claim was based on the alleged effect of New Edge's actions on Penn's contracts with third parties, not the service agreement.[87]) In response to a motion to dismiss based on the service agreement's forum-selection clause, Penn argued its claims were not within the scope of the clause because they were not actions to enforce the services agreement.[88]

---

U.S. Dist. LEXIS 8559, at *24–25 (N.D. Tex. May 9, 2005); *Penn, L.L.C. v. New Edge Network, Inc.*, No. 03 C 5496, 2003 U.S. Dist. LEXIS 17664, at *6–7 (N.D. Ill. Oct. 1, 2003).

[84] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *1–2.

[85] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *2.

[86] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *2–3.

[87] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *2–3.

[88] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *2–3.

The district court rejected this argument, stating "[i]f enforcement of a provision in the service agreement is clearly a defense to a claim, that claim involves a right or remedy under the contract and should fall within the scope of the forum selection clause."[89] The court's conclusion succinctly summarizes its analysis: "Otherwise, a clever party could simply avoid its contractual obligations through sophistry."[90]

A nearly identical scenario is presented by this case. Mr. Wickline is resisting application of the Contract's forum-selection clause—one he acknowledges to be valid and binding— because he believes his claims have not been asserted within an action to enforce provisions of the Contract. Just as in *Penn*, Mr. Wickline's attempt to avoid his contractual obligations is mere sophistry.

Finally, Mr. Wickline's argument that he has pleaded around OSU and Mr. Holder's privilege and justification defenses is specious.[91] As explained in the trial court, the mere ***implication*** of a defense found within a contract containing a forum-selection clause is sufficient to trigger the clause:

> The Court reiterates that its finding that the forum selection clause is applicable does not resolve the issue of whether the Stock Purchase Agreements are in fact valid defenses to [Plaintiff's] claims. However, such determination requires the Court to examine the Stock Purchase

---

[89] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *7.

[90] *Penn*, 2003 U.S. Dist. LEXIS 17664, at *7.

[91] *See* Appellant's brief, at 13–14.

Agreements, thereby invoking the forum selection clauses found in these Agreements.[92]

Because OSU and Mr. Holder's right to seek payment of liquidated damages under the Contract must be evaluated in this civil proceeding, the Contract's forum-selection clause was triggered and Mr. Wickline's tortious-interference claim was properly dismissed.

## PRAYER

Mr. Wickline's Texas lawsuit is a transparent attempt to move the consideration of his breach-of-contract claim with OSU from Stillwater, Oklahoma, to Austin, Texas. The scope of the Contract's forum-selection clause is broad enough to encompass: (i) a claim to interpret the very contract containing the forum-selection clause, and (ii) a baseless tort claim, the defenses to which are found within the contract containing the forum-selection clause. This case belongs in the parties' agreed-upon forum: the Payne County District Court of Payne County, Oklahoma, where a first-filed suit is, and was, already pending. The trial court did not abuse its discretion in granting OSU and Mr. Holder's motion to dismiss.

Defendants – Appellees Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University, and James Michael Holder, in his individual capacity and in his capacity as Vice

---

[92] *Excentus*, 2012 U.S. Dist. LEXIS 91250, at *16.

President for Athletic Programs and Director of Intercollegiate Athletics for Oklahoma State University, therefore respectfully request that the district court's order dismissing without prejudice Mr. Wickline's claims be affirmed.

Dated: April 10, 2015

Respectfully submitted,

HOWRY BREEN & HERMAN, LLP

_____
Sean E. Breen
State Bar No. 00783715
sbreen@howrybreen.com
Randy R. Howry
State Bar No. 10121690
rhowry@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
1900 Pearl Street
Austin, Texas 78705-5408
Telephone: (512) 474-7300
Facsimile: (512) 474-8557

*Attorneys for Appellees*

# CERTIFICATE OF COMPLIANCE

As required by Rule 9.4(e) of the Texas Rules of Appellate Procedure, I certify this is a computer-generated document created in Microsoft Word 2013, using 14-point typeface for all text, except for any footnotes, which are in 12-point typeface.

As required by Rule 9.4(i)(3), I certify that this brief contains 5,121 words, not including the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare this document.

_____
Sean E. Breen

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on April 10, 2015, in compliance with Rules 9.5(b) of the Texas Rules of Appellate Procedure, to the parties listed and in the manner indicated below.

David J. Beck
dbeck@beckredden.com
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel. (713) 951-3700
Fax (713) 951-3720

Karson K. Thompson
kthompson@beckredden.com
Christopher Cowan
ccowan@beckredden.com
BECK REDDEN LLP
515 Congress Avenue, Suite 1750
Austin, Texas 78701
Tel. (512) 708-1000
Fax (512) 708-1002

✓ Electronic service
□ In person
□ Registered mail, return receipt requested
□ Commercial delivery service
□ Facsimile
✓ Electronic mail

*Attorneys for Plaintiff – Appellant*
*Gregory Joe Wickline*

Sean E. Breen

No. 03-15-00077-CV

---

IN THE COURT OF APPEALS FOR THE
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN, TEXAS

---

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

v.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

---

## APPELLEES' APPENDIX

---

**Appeal from the 98th Judicial District Court of Travis County, Texas**
Cause No. D-1-GN-14-004391

---

| Tab | Description | CR Range |
|-----|-------------|----------|
| 1 | Fowler article | 116–18 |
| 2 | Olson article | 119–20 |
| 3 | Holder letter | 121–22 |
| 4 | Stephens letter | 123 |
| 5 | Oklahoma original petition | 124–44 |
| 6 | Texas original petition | 3–9 |
| 7 | OSU's special appearance and original answer | 10–36 |
| 8 | Mr. Holder's special appearance and original answer | 37–63 |

No. 03-15-00077-CV

# IN THE COURT OF APPEALS FOR THE THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN, TEXAS

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

# TAB 1



⊕CBSSPORTS.com  NOW ON CBS SPORTS NETWORK    Sign In | Register    Help    Shop    TV    Radio    Mobile
The Doug Gottlieb Show

NFL    MLB    NBA    NHL    NCAA FB    NCAA BB    GOLF    HIGH SCHOOL    LOCAL    VIDEO    MORE    FANTASY

NCAA FB Home    Scores    Standings    Schedules    Stats    Teams    Players    Rankings    Picks    Playoff    Recruiting

MY SCORES    ⌄    Sign In or Not a member? Register Now    ALL SCORES

JEREMY **FOWLER**
College Football Insider
 Follow

# Charlie Strong getting comfortable at Texas, with movie-star help

March 7, 2014 7:33 pm ET



 Like {51}    Tweet 179    +1 0    • Shr



Charlie Strong says he'll handle the challenges of being Texas' coach in his own way. (USATSI)

AUSTIN, Texas -- Charlie Strong got a phone message from Oscar winner Matthew McConaughey the other day. Hasn't returned it yet but plans to soon. He did have a nice talk with McConaughey's former fraternity den mother the other day, though.

He spotted Johnny Depp in Austin last night but didn't stop and say hi. Strong had to rest for one of his 5-mile runs at 4:30 a.m. -- which, depending on the day, precedes a three-stop flight to high school coaches around the state or Junior Day on campus for recruits.

**RIVALRY RENEWAL?**
Strong favors A&M game

This is Texas' new coach finding balance, trying to be normal in a job known to bend the frames of normalcy.

Until proven otherwise, winning isn't enough at Texas. Longhorn Network schedules must be fulfilled and millionaires must be glad-handed.

So Strong, whose coaching prowess is palpable after a 23-3 record and bowl wins over traditional Florida power programs his last two years at Louisville, blends the job's political demands with his own personality, a marriage fueled by intrigue from now until August.



116

Will he juggle these duties or jog past them?

Strong says he'll handle them, in his own way.

"I can only be myself," Strong said in an interview Friday, wearing a dark-gray turtleneck with the burnt-orange UT emblem on the chest. "I can't be Coach [Mack] Brown and he wouldn't want me to be. We have a chance to build our own."

Being himself, Strong says, includes embracing the ambassador role that Brown mastered. Many media members openly wondered about Strong's ability in this area upon his January hiring because of the perception he was inaccessible or even introverted while at Louisville.

Brown, of course, seemed to revel in the face-of-the-program role but couldn't win enough games to continue sitting underneath press conference lights.

Strong makes clear he has no problems engaging with media, fans and boosters. In fact, he often enjoys it.

"I take time out. I don't want anyone to ever feel like I'm bigger than anyone or that this job is bigger than this university," Strong said. "It's all about the program."

Strong believes he got the closed-off rep while at Louisville because of his decision to cancel spring-practice access after no media showed up for a practice that coincided with a Louisville basketball run in the NCAA tournament.

"We go out to practice and no media came to practice," said Strong with a laugh. "So I said 'OK, ya'll don't want to come, ya'll don't have to come, the media's shut out of practice.' I think that's why everybody got upset. I just said you could have sent a beat writer or someone there."

After running this story by a few local reporters, aparently media staffs were largely out of town while Kentucky and Louisville played in the Final Four in New Orleans.

The outreach will come -- Strong's already contacted Dell Children's Medical Center about making frequent visits -- but Strong also must address a pressing goal: get to know his team. He has spent minimal time with players since taking the job, which makes him eager to start spring practice the week after next.

He's finally in the office, not traveling for the first time in two months. Time to coach some drills. Time to see who's coachable, who makes a play in two-minute drill.

Texas will open camp with quarterbacks David Ash, who missed most of last season with multiple concussions, and Tyrone Swoopes. USC transfer Max Wittek is expected to visit a practice with his mother, according to a source, possibly a final step before commitment.

Strong inherits a roster that lost zero defections to the NFL draft and eschewed academic issues or resentment over the coaching change, Strong said.

This is Strong's hat tip to Brown, whom Strong spoke with shortly after his hiring but hasn't spoken since. Brown is giving Strong his space.

"I walked into a situation that's almost like someone gave you the keys to the car," Strong said. "You can do a little work on it but I don't have to do a lot of work where you're going to waste all of your money fixing this car up. I know I have big shoes to follow, but I have a chance to follow someone that left a program in great shape."

Now his offensive coaches must maximize the talent. Assistant head coach for offense/QB coach Shawn Watson, who was with Strong at Louisville and developed Teddy Bridgewater, is "gonna be in charge" of playcalling, Strong said. Offensive coordinator/offensive line coach Joe Wickline also will be heavily involved. In fact, spokesman John Bianco said Friday the expectation is Wickline will call plays on game days, which echoes reports out of Austin on Jan. 15.

It's all a bit convoluted, but Watson will run game-planning/offensive organization while collaboration will be paramount.

"If you need one voice, he'll be the voice," said Strong about Watson. "Those guys are gonna work together."

Strong says he doesn't see "an issue at all" with those two collaborating in an offense that can go no-huddle, a staple of the Big 12. Louisville was 69th nationally in plays per game last season.

"We'll be very multiple on offense, we'll be very aggressive on defense," Strong said.

Strong's decisions on playcalling and, well, everything will be dissected every weekend in the fall, as is customary for a $5-million-a-year coach.

Strong wasn't ready for that pressure-cooker a year ago, in part because he didn't want to leave Louisville after three seasons. He was embedded, he said. He had told Tennessee no in 2012. He didn't want to leave players he just recruited. Once the UT job arose after year four, even a few trusted Louisville players told him, 'Coach, you have to do that. You have to take that job.' "

Two months later, he "can't wait to get out there" on the field, under the lights for thousands to see.

Strong knows he can't quietly walk the streets or conduct secret santa claus visits (which he did at Louisville) during the holidays without *someone* finding out.

Get the team ready first, then maybe he can find quiet time on occasion.

"The last few years they've been knocked down," Strong said. "We need to get them built back up."

**Topics:** Texas Longhorns, NCAAF

## ABOUT JEREMY **FOWLER**



Jeremy Fowler is a national college football insider with CBSSports.com. Fowler joined CBS in 2012 after covering the Minnesota Vikings for the St. Paul Pioneer Press for two seasons and covering the Florida Gators for the Orlando Sentinel for two years. Fowler is also a contributor to the CBS Sports Network.



No. 03-15-00077-CV

## IN THE COURT OF APPEALS FOR THE
## THIRD JUDICIAL DISTRICT OF TEXAS
## AT AUSTIN, TEXAS

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

## TAB 2





Wednesday, March 19, 2014

# Strong: Watson 'final voice' of UT offense

By Max Olson

5

AUSTIN, Texas -- Charlie Strong finally put an end to all the confusion on Tuesday. Or did he?

The great question is who exactly is responsible for calling the offensive plays at Texas, a topic that seemed fairly cut and dried when Strong first addressed it on Jan. 15, following the hiring of his staff.

"Joe Wickline will call plays on offense," Strong said then. "He's the offensive coordinator; he will call plays."

Wickline is indeed the offensive coordinator after nine years of coaching the offensive line at Oklahoma State. Shawn Watson was hired as the assistant head coach of the offense and quarterbacks coach after serving as Strong's offensive coordinator and playcaller at Louisville, and Strong insisted in January that Watson will be heavily involved in influencing the Longhorns offense.

This seemed like a simple plan at the time, but then a different message started to spread.

Earlier this month, Strong told CBS' Jeremy Fowler that Watson is "gonna be in charge" of play calling and will run the game planning and organization of the offense.

This came just days after Wickline and Watson each met with Texas reporters for the first time and explained that their efforts to oversee the Longhorns offense would be a collaboration. (Wickline discussed his relationship with Watson in this Q&A.) And Strong's quotes to CBS led to a Texas spokesperson confirming to multiple outlets that, yes, Wickline was still expected to call plays on game day.



Shawn Watson, shown at Nebraska in 2010, is the assistant head coach of the Texas offense and will be in charge of play calling, though he won't necessarily be the playcaller.

There are some off-the-field aspects of this story, too. Watson will be paid more than Wickline. And as the Austin American-Statesman reported in January, language in Wickline's contract at Oklahoma State demanded that Texas would have to pay OSU a sum of $600,000 if Wickline wasn't named "offensive coordinator (with play-calling duties)."

So, what's going on here? Strong was given a chance to clarify Tuesday after his first spring practice.

"The one final voice will be Shawn," Strong said. "Joe is the offensive coordinator. Shawn is the assistant head coach in charge of the offense. Two guys work together."

Strong went on to explain that such a split is, in his experience, not uncommon. He was co-defensive

coordinator with Greg Mattison for three years at Florida, from 2005 to 2007, and they both made calls. Sometimes those calls were overruled by Urban Meyer. They all made it work. He believes his offensive coaches can handle this.

"When you talk about play-calling duties, they're mature enough. They've been around it enough. Neither one has an ego," Strong said. "Wickline is going to be involved in it. He's going to make some calls. Shawn is going to make some calls. When we go down the stretch and we have to have a call made, I think Shawn, because he's been doing it for a long time and I'm comfortable with him.

**More on Texas**

For full coverage of the Longhorns, check out the Texas blog, part of ESPN's College Football Nation. Blog

**More:**
- Texas' clubhouse page
- ESPN.com's Big 12 blog
- ESPN Dallas' college blog

"I don't think it will ever be an issue because those two guys have been around too long for the egos. I'm not going to put up with it and they know that. We're not here for ourselves; we're here for these players. And if you have an ego, you're working at the wrong place. Check your ego at the door and let's get going around here. We're here to win and get these young men graduated."

So there's your answer. Watson has final say. Both coaches will contribute play calls. It might sound like a convoluted plan, but that's the plan.

It's not that Strong is attempting to play a shell game and fool everybody. More likely, he's just working with two coaches he knows and trusts and is trying to give both the responsibilities they want.

This may be causing consternation with the fan base, but that doesn't seem to be the case internally. Wickline and Watson publicly act comfortable and confident when talking about their respective roles and about this collaboration process.

Of course, this scheme also threatens to cause issues in the moments when Wickline and Watson have conflicting views on what needs to happen. Wickline acknowledged this month that you never really know how a staff will work together until you hit the season, run into problems and must fix them. That's when Texas truly needs to know who its offensive "voice" is, and that title belongs to Watson.

Right now, all Watson and Wickline care about is getting this Texas offense assembled and up to speed. They'll continue to collaborate and cooperate. That's Strong's story, and he's sticking to it.

120

No. 03-15-00077-CV

**IN THE COURT OF APPEALS FOR THE
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN, TEXAS**

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

**TAB 3**



March 24, 2014

Joe Wickline
Texas Football Offices
2012 Robert Dedman Drive
Austin, TX 78712

Re:     Employment Contract – Oklahoma State University

Dear Joe:

Because of our friendship, which I value, this letter is difficult to write. However, as a fellow Athletic Professional, you know that it is one that I must write.

A few weeks ago, you unilaterally and voluntarily terminated your employment contract (the Contract) with Oklahoma State University (OSU). The Contract contains a clause which obligates you to pay liquidated damages to OSU for such a voluntary termination. As you know, because of the significant investment OSU made in you as an assistant coach and because of the known, but difficult to calculate, damages OSU would incur in finding, relocating and training a replacement coach, that clause was intended to compensate OSU should you leave for a lateral position. However, you and OSU agreed those liquidated damages would be waived if you left OSU for a promotion to become a head coach at another NCAA Division I-A university. Accordingly, the Contract was initially phrased:

> "University agrees to release Coach from his obligations under the Contract upon his request in order to enable him to assume employment as a Head Football Coach at a NCAA Division I-A institution..."

Subsequently, the Contract was amended in an attempt to accommodate another potential promotion. Because an Offensive Coordinator (the primary assistant in charge of the entire offense) would ordinarily have attendant play calling duties, the Contract was amended as follows:

> "That in addition to employment as a Head Football Coach, Coach shall also be released from the obligation to pay liquidated damages upon assumption of employment as an Offensive Coordinator (with play calling duties) at a NCAA Division 1-A institution..."

6

Upon your departure from OSU, you advised you had accepted a position at another university as the Offensive Coordinator with "play calling duties."



Athletics Center • Home of Historic Gallagher-Iba Arena • Stillwater, OK 74078-5070

Regrettably, it has come to our attention that neither of those statements is apparently accurate. You are apparently subordinate to not only the Head Coach at your new school, but also to the Assistant Head Coach for Offense. Thus, it appears that your current job is commensurate with your previous job title here as an assistant coach. As you know, when you signed your Contract with OSU, it was not the intent of the parties to waive the liquidated damages clause for such a lateral move.

Further, it has now come to our attention that you **do not** have "play calling duties." Instead, it appears that your Head Coach has confirmed that Shawn Watson, not you, will be calling the plays. Thus, in reality it appears you unilaterally and voluntarily terminated the Contract to make a lateral move and as such a waiver of the liquidated damages clause of the Contract is not triggered.

While OSU wishes you every success in your endeavors and burgeoning career, it is paramount to OSU that contract terms be taken seriously and that they be strictly enforced in the interest of professionalism. Accordingly, OSU will insist upon payment of the liquidated damages clause of the Contract. Those damages are equal to one hundred percent (100%) of the sum of the gross base monthly salary in effect on the date of termination and remaining under the term of the Contract, but for your termination. OSU has calculated that amount at $593,478, which is now due and payable.

We appreciate your attention to this matter and look forward to receipt of your payment. If you would like to discuss this matter further, please contact me at 405-744-7231.

Sincerely,

Mike Holder
Vice President for Athletic Programs
Director of Intercollegiate Athletics

cc:     Steve Stephens, Esq.

122

No. 03-15-00077-CV

## IN THE COURT OF APPEALS FOR THE
## THIRD JUDICIAL DISTRICT OF TEXAS
## AT AUSTIN, TEXAS

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

## TAB 4


Office of Legal Counsel

April 22, 2014

Mr. Joe Wickline
Texas Football Offices
2012 Robert Dedman Drive
Austin, TX  78712

**PERSONAL & CONFIDENTIAL**

**VIA UPS NEXT DAY AIR**

Re:    Employment Contract - Oklahoma State University

Mr. Wickline:

On March 25, 2014 you were sent via overnight courier the enclosed letter in which Oklahoma State University (OSU) explained your obligations and made demand for payment under the liquidated damages clause of your employment contract.

As of the date of this letter, you have failed to respond.  As provided for under the terms of your employment contract, you are hereby given thirty (30) days notice, upon the expiration of which, we are prepared to file the enclosed Petition in the District Court of Payne County Oklahoma. As provided for in your contract, we hope to use this period to engage in good faith negotiations aimed at resolving this dispute without litigation. Should you be interested in opening that dialogue, please have your attorney contact me.

We appreciate your prompt attention to this matter.

Sincerely,

Steve Stephens
General Counsel

SRS/jap/cp
Enclosures
cc:    Gary Clark, Esq.
       Mike Holder
       Jason Lewis

STUDENT UNION BUILDING / OKLAHOMA STATE UNIVERSITY / STILLWATER, OK 74078-7044
Telephone (405) 744-6494 / Fax (405) 744-7998

7     123

No. 03-15-00077-CV

## IN THE COURT OF APPEALS FOR THE
## THIRD JUDICIAL DISTRICT OF TEXAS
## AT AUSTIN, TEXAS

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

# TAB 5



IN THE DISTRICT COURT C
Payne, County, Oklahoma
FILED

OCT 17 2014

LISA S. LAMBERT, Court Clerk

By: _____

Dept

# IN THE DISTRICT COURT OF PAYNE COUNTY
## STATE OF OKLAHOMA

BOARD OF REGENTS for the )
Oklahoma Agricultural and Mechanical Colleges, )
acting for and on behalf of Oklahoma State University, )
)
Plaintiff, )
)
)
)
v. )
)
GREGORY JOE WICKLINE )
)
)
)
Defendant. )

CASE NO.: CJ-2014-430

JUDGE: Kistler

State of Oklahoma
County of Payne
I, Lisa S. Lambert, Court Clerk, in and for Payne County, OK, do hereby certify that the above and foregoing is a true and correct copy of the original instrument now on file and of record in my office at Stillwater, OK. In testimony hereof I have hereunto set my hand and affixed my official seal this _____ day of _____, 20____.
LISA S. LAMBERT, Court Clerk

## PETITION

Plaintiff, BOARD OF REGENTS for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University, (hereinafter "OSU"), for its claims against Defendant, GREGORY JOE WICKLINE (hereinafter "Wickline"), alleges and states as follows:

### PARTIES

1. OSU is a governmental entity and an institution corporate under the Constitution and laws of the State of Oklahoma.

2. Upon information and belief, Wickline is a resident of the state of Texas.

### VENUE AND JURISDICTION

3. Pursuant to an employment contract dated January 1, 2009 (hereinafter "Contract"), between OSU and Wickline, venue and jurisdiction are proper in this Court.

1



## FACTUAL BACKGROUND

4.      On or about January 1, 2009, Wickline entered into the Contract (a copy of which is attached hereto as "Exhibit A") with OSU to serve as an Assistant Coach for OSU's Intercollegiate Football Team.

5.      The Contract was subsequently amended (a copy of said amendments are attached hereto as "Exhibit B" and "Exhibit C") through mutual agreement executed in writing.

6.      Pursuant to Section 11 of the Contract, as amended, OSU and Wickline agreed that Wickline had special, exceptional, and unique knowledge, skill, and ability as a football coach.

7.      In the Contract, as amended, Wickline recognized that the loss of his services to OSU, without OSU's approval and release, prior to the expiration of the term of the Contract, as amended, would cause an inherent loss to OSU incapable of estimation with certainty, fairness or adequate compensation through monetary damages.

8.      In the Contract, as amended, Wickline specifically promised not to accept employment, under any circumstances, as a football coach at any National Collegiate Athletic Association (hereinafter "NCAA") member institution of higher education prior to the expiration of his contractual obligations to OSU or without first being released from the Contract, as amended, or reaching a negotiated settlement.

9.      In the event of a breach by Wickline's acceptance of employment by a member institution of the Big Twelve Conference prior to the expiration of his contractual obligations, Section 11 of the Contract, as amended, provided for liquidated damages to be paid to OSU in a sum equal to one hundred percent (100%) of the sum of Wickline's gross base monthly salary in effect at the date of termination and remaining due.

2

10.     Section 11 of the Contract, as amended, provided that Wickline would only be released from the liquidated damages provision of the Contract, as amended, if he was leaving OSU to accept employment as a Head Football Coach or as an Offensive Coordinator with play calling duties.

11.     Upon Wickline's departure from OSU, he represented that the position he accepted at the University of Texas was as Offensive Coordinator with play calling duties.

12.     Upon information and belief, Wickline is neither the Offensive Coordinator, nor does he have play calling duties. Instead, he is an Assistant Coach in charge of the offensive line, which is a lateral move from Wickline's position at OSU and one that does not fall within the exception to pay liquidated damages.

13.     As a result of this lateral move, Wickline is obligated to pay the liquidated damages specifically bargained for under the Contract, as amended.

14.     On or about March 24, 2014, OSU contacted Wickline via letter sent by UPS Next Day Air making demand for payment (a copy of that letter is attached hereto as "Exhibit D").

15.     On or about April 22, 2014, OSU again contacted Wickline making demand for payment and informing Wickline of OSU's intent to file suit upon the expiration of thirty (30) days as required by the Contract, as amended (a copy of that letter is attached hereto as "Exhibit E").

## CLAIM FOR BREACH OF CONTRACT

16.     OSU restates and incorporates the allegations set forth in Paragraphs 1 – 15 as fully set forth herein.

3

17. Wickline through failure to pay liquidated damages, which he knowingly bargained for and agreed to, has breached and continues to breach the Contract, as amended, with OSU.

18. OSU seeks enforcement of the liquidated damages provision of the Contract, as amended.

WHEREFORE, Plaintiff prays for judgment against Wickline for the following:

A. Enforcement of the liquidated damages provision set forth in Section 11 of the Contract, as amended, with payment due to OSU in the amount of $593,478.00;

B. Interest, reasonable attorneys' fees (if allowable by Contract or statute) and costs; and

C. All other relief to which Plaintiff may be entitled.

Respectfully submitted,

Steve Stephens, OBA#10479
John A. Price, OBA#16880
Office of Legal Counsel
Oklahoma A&M Board of Regents
5th Floor Student Union
Stillwater, OK 74078
(405) 744-6494 (Phone)
(405) 744-7998 (Fax)
*Attorneys for Plaintiff*

Michael P. Martin, OBA#22225
Scott Jackson, OBA #17502
MARTIN, JEAN & JACKSON
502 S. Duck
Stillwater, OK 74074
(405) 377-5000 (Phone)
(405) 377-5011 (Fax)
*Attorneys for Plaintiff*

## EMPLOYMENT CONTRACT

This Agreement, made by and between OKLAHOMA STATE UNIVERSITY, hereinafter referred to as the "University", and Gregory Joe Wickline, hereinafter referred to as "Coach";

WITNESSETH:

WHEREAS, University requires the services of an Assistant Coach for the University's Intercollegiate Football Team; and

WHEREAS, Gregory Joe Wickline meets the University's qualifications for the position and has been employed as such by University pursuant to an Employment Contract and Amendments thereto all of which the parties intend to cancel and replace by this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the University and the Coach agree as follows:

1.   Subject to the conditions stated in the provisions of this agreement, the University hereby employs Coach as Assistant Coach for the University's Intercollegiate Football Team at Oklahoma State University for a designated period beginning with the 1st day of January, 2009 and ending on the first to occur of any of the following: (i) December 31, 2013; (ii) 180 days following the resignation of the Head Football Coach; or (iii) termination of this Contract as otherwise provided herein.  The Coach hereby agrees to and does accept the terms and conditions for said employment for the designated period.  Neither this Contract nor Coach's employment hereunder shall in any way grant the Coach a claim to tenure in employment, or any years of employment attributable to tenure within the University.

2.   The compensation paid by the University to the Coach for services and satisfactory performance of the conditions of this Contract shall be at the annual salary rate of $157,500.00 per annum payable in monthly installments out of legally available funds by the University to the Coach on the last day of each calendar month during the term of this Contract.  In addition, Coach shall

1

# EXHIBIT A

receive from legally available funds bonuses earned, if any, based on the performance incentives attained in the football season of the then current fiscal year in accordance with "Exhibit A" entitled "Financial Incentives," attached hereto and made a part hereof. It is agreed that the compensation so paid shall be subject to the same payroll deductions (for example, state and federal taxes, F.I.C.A. withholding, and retirement plans) that apply to University administrative and professional (A&P) employees. The Coach shall be eligible to participate in group insurance and retirement programs and voluntary payroll deduction programs on the same basis, and with the same employer contributions, that apply to University administrative and professional (A&P) employees.

3. The Coach shall devote his full time and attention to such duties and responsibilities as an Assistant Coach as assigned by and serving under the direction of the University's Head Football Coach. The Coach shall conduct such travel as is necessary to carry out his duties and the Coach shall be entitled to reimbursement for transportation and per diem expenses at the maximum rate authorized by law and University regulations.

4. The Coach shall recognize and comply with the policies, rules, and regulations of and governing Oklahoma State University and its employees and the rules of the Big Twelve Conference and the National Collegiate Athletic Association, as now constituted or as any of the same may be amended during the term hereof.

Coach shall respond, and shall not counsel or instruct any coach, student, or any other person to fail to respond, accurately and fully within a reasonable time to any reasonable request or inquiry relating to the performance of his duties hereunder or the performance of his duties during his prior employment at any other institution of higher learning propounded by University, NCAA, the Big Twelve Conference or other governing body having supervision over the athletic programs of University or such other institution of higher learning, or required by law, governing athletic rules or University policies and regulations.

Without limitation upon any right or remedy of the University in the event the Coach breaches this Contract, it is specifically agreed that if the

2

129

University finds after due hearing that the Coach is, has been, or was at any time, involved in violations of the NCAA legislation applicable to University or to any prior employer of the Coach which was at the time of such employment a member of NCAA, it may take one or more of the following actions that it deems appropriate: (1) termination of employment; (2) suspension, with or without pay, for a period of time as the University shall determine; (3) modification of duties; or (4) reassignment to other employment duties within the University.

Coach shall indemnify the University for all costs (including attorney fees) incurred by University in responding to any official inquiry of the NCAA resulting in a show cause penalty against the Coach by the Infractions Committee.

5. Coach shall conduct himself with due regard to public convention and morals, shall not do any act that will tend to degrade him in society or bring him into public hatred, contempt, scorn, or ridicule, or that will tend to shock, or insult the community or offend public morals or decency, and he shall not do any act that tends to impair his capacity to fully comply with his obligations hereunder.

6. Coach recognizes that University has assigned a high priority to the academic achievement of the students who participate in its athletic programs and that it is the expectation of the President and the Board of Regents that Coach will emphasize the importance of academic achievement to the students who are athletes at the University. Coach shall maintain a cooperative relationship with Academic Services for Student-Athletes in order to assure student-athletes are offered every opportunity to achieve academic expectations and success.

7. Coach shall comply fully with all NCAA, Conference, and institutional regulations governing outside employment and compensation.

Any television, radio, consultant, endorsement, or outside employment agreement or contract of any nature as well as all other activities related to Coach's involvement in University athletics will be under the supervision, direction, and control of the Athletic Director. All such arrangements and activities must first be approved annually in writing by the Athletic Director and shall not conflict with the best interest of the University.

3

130

Coach must receive annually prior written approval from the President for all athletically related income and benefits from sources outside the institution, including but not limited to income from gifts to Coach from donors or from friends of the Athletic Department; annuities; sports camps; housing benefits (including preferential arrangements); country club memberships; complimentary ticket sales; television and radio programs; and endorsements or consultation contracts with athletics shoe, apparel, or equipment manufacturers.

It is specifically understood that Coach shall not use, directly or by implication, the name of the University or its logos in the endorsement of commercial products or services for personal gain without the prior written approval of the President.

8. The University reserves the right to either terminate this Contract, or to suspend the Coach for a period of time from performance of duties with or without pay without termination of this Contract for cause, including but not limited to any of the following : (1) the University has a reasonable basis for believing Coach has been involved in deliberate and significant or repetitive violations of Provision No. 4 of this Agreement, or (2) failure of Coach to comply with any of the provisions set forth in Provision Nos. 5 or 11 of this Agreement, or (3) any conduct of Coach in violation of any criminal statute (excluding minor traffic offenses) whether prosecuted or not, or any act of moral turpitude, or (4) violations by Coach of any of the other terms of this Agreement which cannot be or has not been remedied after thirty (30) days written notice thereof to Coach, or (5) conduct of Coach determined by the University to be seriously prejudicial to its best interests or the best interests of its athletic program, or (6) material misrepresentation of Coach's educational or other qualifications for employment as Coach hereunder, or (7) fraud or dishonesty of Coach in the performance of his duties or responsibilities under this Agreement, or (8) use or consumption by Coach of alcoholic beverages, drugs, controlled substances, steroids or other chemicals in such degree and for such appreciable period as to impair significantly or materially his ability to perform his duties hereunder or failure by Coach to fully cooperate in the enforcement and

4

131

implementation of any drug testing program established by University for student-athletes, or (9) any cause adequate to sustain the termination or suspension, as the case may be, of any other University employee.

The Head Football Coach or the Director of Intercollegiate Athletics shall have the administrative authority to order suspension of the Coach from duties and salary for causes identified in this Provision No. 8, provided, that notice of any such suspension shall be provided in writing, detailing the reasons for such suspension, and setting forth a reasonable time within which Coach may respond to same. The Coach shall have the procedural right, upon his written request, for a review and hearing relative to any such suspension. Any such hearing shall be governed by the normal University grievance procedures provided for administrative and professional (A&P) employees, as now or hereafter amended, unless other procedures are agreed upon by the parties in lieu thereof.

Termination of this Contract by the University may occur only after recommendation of such action by the Head Football Coach and approval thereof by the Director of Intercollegiate Athletics. If such adverse action is to be initiated for causes identified in this Provision No. 8, the Head Football Coach shall inform Coach in writing of his preliminary intent to recommend termination before making any such formal recommendation to the Director of Intercollegiate Athletics. In such case, the Head Football Coach will inform Coach in writing of specific concerns and provide Coach a meaningful opportunity to address the concerns of the Head Football Coach within a reasonable period of time (in no event less than fifteen (15) days) before proceeding with an adverse recommendation. Any other hearing which may be permitted shall be governed by the normal University grievance procedures provided for administrative and professional (A&P) employees, as now or hereafter amended unless other procedures are agreed upon by the parties in lieu thereof.

In the event this Contract is terminated by University for cause or causes under this Provision No. 8, University's sole liability to Coach shall be limited to payment of salary or installments thereof, which may have been earned and accrued before the end of the month of such termination.

5

132

9. Notwithstanding the term of duration of this Contract as stated in Paragraph One (1) hereof, and subject to the terms of Paragraphs Ten (10) and Eleven (11) hereof, either party may terminate this Contract without particular cause by giving written notice to the other party of the terminating party's exercise of this right to terminate. Such termination shall be effective immediately upon receipt of such written notice by the other party, unless specified otherwise in said written notice.

10. In the event University terminates this Contract without cause under Paragraph Nine (9) hereof, then Coach agrees to accept liquidated damages as specified in this Section 10 in complete satisfaction of and payment in full for all obligations, if any, due and owing by University to Coach. As liquidated damages, University shall pay Coach a sum equal to the sum of the gross base monthly salary in effect on the date of termination and remaining due under Section 2 of this Contract but for termination of the Contract, payable in equal monthly installments from legally available funds until the date on which the Contract would have expired, plus any bonuses (i.e., "Financial Incentives" as set forth in "Exhibit A") earned as of the date of termination. Coach shall be responsible for all taxes thereon. Coach shall be entitled to maintain health insurance coverage, at Coach's sole expense, as provided under law.

The parties have bargained for and agreed to this liquidated damages provision and have agreed that the payment of such liquidated damages shall constitute reasonable and adequate compensation for damages that might ensue as a result of University's termination of this Contract without cause, including any loss by Coach of any collateral business opportunities or any other benefits, perquisites or income from any other sources or agreements. Said liquidated damages shall not be construed as a penalty.

Notwithstanding the foregoing, a condition precedent to the University's obligations to pay the foregoing payments is that Coach diligently seek mitigation of this payment obligation by obtaining full-time employment, business or professional income (for example, but not limited to, football coaching, media commentator, speaking engagements, teaching or other academic activities,

6

133

consulting or participation in business or any other income producing opportunities). Coach shall begin and shall thereafter continue making very diligent efforts to obtain such income as soon as practicable but not later than thirty (30) days following such termination and each thirty (30) days thereafter shall provide University with a written report of the specific efforts undertaken in this regard including the amount of income, if any, resulting directly or indirectly therefrom. University's financial obligation under this Contract shall cease or be reduced commensurately by the amount of any such income.

11. The Coach agrees that he will not personally or, directly or indirectly, through any agent or representative, inquire into, seek, negotiate for, or accept other full-time or part-time employment of any nature at any time during the term of this Contract without first having obtained the written permission of the Head Football Coach and the Director of Intercollegiate Athletics, which permission shall not be unreasonably withheld.

The parties hereby agree that Coach has special, exceptional, and unique knowledge, skill, and ability as a football coach which, in addition to future acquisitions of coaching experience at the University, as well as the University's special need for continuity in its Intercollegiate Football Program, will render the Coach's services unique. The Coach recognizes that the loss of Coach's services to the University, without University approval and release, prior to the expiration of the term of this Contract or any renewal thereof, would cause an inherent loss to the University which cannot be estimated with certainty, or fairly or adequately compensated by money damages.

The Coach therefore agrees, and hereby specifically promises, not to accept employment, under any circumstances, as a football coach at any institution of higher education which is a member of the National Collegiate Athletic Association, or for any football team participating in any professional league or conference in the United States or elsewhere, requiring performance of duties prior to the expiration date of the term of this Contract or any extension thereof, without first obtaining a release of this Contract, or a negotiated settlement thereof in writing accepted by the Coach and the Director of

7

134

Intercollegiate Athletics and approved by the President of the University.

In the event of Coach's termination of this Contract without cause under Paragraph Nine (9) hereof prior to its expiration date without first obtaining a release therefrom by the University, Coach shall pay to University, as liquidated damages, a sum equal to fifty percent (50%) of the sum of the gross base monthly salary in effect on the date of termination and remaining due under Section 2 of this Contract but for termination of the Contract, said sum to become due and payable within thirty (30) days of the effective date of termination of the Contract, *provided, however,* University agrees to release Coach from his obligations under the Contract upon his request in order to enable him to assume employment as a Head Football Coach at a NCAA Division I-A institution and thereafter no liquidated damages shall be payable by Coach upon his termination of the Contract without cause. The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that University will incur administrative, recruiting, resettlement, and other costs in obtaining a replacement for Coach, in addition to potentially increased compensation costs if Coach terminates this Agreement prior to its expiration, which damages are extremely difficult or impracticable to determine with certainty. The payment of said sum shall constitute adequate and reasonable compensation to the University for the damages and injury suffered because of such termination by Coach. The foregoing shall not be, nor be construed to be, a penalty.

12. The Coach shall be entitled to annual vacation or leave time and sick leave in accordance with University policies governing administrative and professional (A&P) employees; except, however, no terminal vacation leave (i.e., accrued but unused annual leave) shall be due to or claimed by Coach upon termination or separation from University employment.

13. The University, as additional compensation to Coach, shall make arrangements for the provision to Coach on a loan basis an automobile for his use. It is further agreed that University shall provide and make available to Coach appropriate gasoline credit cards for Coach's use in the performance of his

duties with the University pursuant to this Contract, which cards shall be available to Coach throughout the term of this Contract. The University further agrees to provide appropriate liability and comprehensive automobile insurance to cover Coach in the use and operation of said vehicle, during the term of this Contract.

14. Any action to enforce any of the provisions of this Agreement shall be filed in the Payne County District Court. No such action may be filed until the party claiming to be aggrieved shall first have delivered to the other a written notice of intention to file suit, including an outline of complaints. This notice shall be delivered at least 30 days before any suit is filed, and the parties shall use that period to engage in good-faith negotiations aimed at resolving the dispute without litigation. This paragraph is not intended to limit or circumscribe the legal rights of any party thereto, but rather to ensure that the parties exhaust all avenues of seeking a mutually agreeable accommodation of their differences before instituting litigation. In any situation where the terms of this paragraph might affect the legal rights of any party hereto, the parties shall stipulate to appropriate extensions of limitation periods and other matters to eliminate any such potential effect.

15. It is understood and agreed that this Contract shall not be effective until signed by the President of Oklahoma State University, with the recommendation of its Head Football Coach and its Director of Intercollegiate Athletics, and that no amendments, alterations, or interpretations thereof shall be binding upon the University unless so made in writing and so approved by the President.

16. The relationship between the Coach and the University shall be determined solely by the terms and conditions of this Contract and this Contract supersedes and replaces all previous agreements between the parties and amendments thereto which are hereby cancelled by mutual consent.

17. This Contract has been entered into under and shall be governed by the laws of the State of Oklahoma and any provision of this Contract prohibited by the laws of said State shall be ineffective to the extent of such prohibition

9

without invalidating the remaining provisions of this Contract.

18. This Contract may be amended by mutual agreement executed in writing and appended hereto. It is contemplated that any adjustments in compensation paid the Coach that may be agreed upon will be accomplished in the same manner and on the same forms as are utilized by the University for other Athletic Department and University employees.

DATED as of the 1st day of January, 2009.

Recommended:

_____
Michael R. Gundy
Head Football Coach

COACH

_____
Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

_____
Mike Holder, Vice President for
Athletic Programs and Director
of Intercollegiate Athletics

By: _____
    V. Burns Hargis
    President

10

137

## Financial Incentives

*Overall Performance Incentives*

| Category | Base Amount |
|---|---|
| **Championship** | |
| National Championship | $20,000.00 |
| Big 12 Championship | $10,000.00 |
| Big 12 South Championship | $ 5,000.00 |

**Final National Ranking – CNN/USA Today Poll**

| | |
|---|---|
| Top 10 | $5,000.00 |
| 11-15 | $3,000.00 |
| 16-25 | $2,000.00 |

**Post Season Bowl Game Participation***

| | |
|---|---|
| BCS Bowl | Up to 2 months University salary as determined by the Athletic Director |
| All Others | Up to 1 month University salary as determined by the Athletic Director |

*Post Season Bowl Incentive payments shall not be earned by or payable to Coach if he voluntarily leaves the employment of the University and/or terminates this Contract without cause prior to the official date for signing of the National Letter of Intent for the sport of football following the Bowl appearance.**

The incentives will be paid according to the highest level achieved in each category. Thus, only one payment per category is applicable. *The decision of the Athletic Director shall be final as to any interpretations or disputes pertaining to these financial incentives.*

138

Exhibit A

# FIRST AMENDMENT
## TO
## EMPLOYMENT CONTRACT

This First Amendment is hereby entered into effective this 1st day of January 2011 to that certain Employment Contract dated January 1, 2009, between Oklahoma State University and Gregory Joe Wickline.

IN CONSIDERATION of the performance of the covenants and conditions contained herein and in the said Employment Contract dated January 1, 2009, the parties hereto agree that said Employment Contract is hereby amended in the following respects only:

- The annual salary set forth in Paragraph Two (2) is hereby increased to $200,000.00 beginning January 1, 2011;
- Paragraph 1.(ii) is modified to read as follows "one year following the resignation of the Head Football Coach; or";
- In Section 11 the referenced percentage for calculating liquidated damages payable by Coach to University shall be increased to seventy-five percent (75%);
- That in addition to employment as a Head Football Coach, Coach shall also be released from the obligation to pay liquidated damages upon assumption of employment as an Offensive Coordinator (with play calling duties) at a NCAA Division I-A institution or as an Assistant Coach in the NFL; and
- "Exhibit A" entitled "Financial Incentives" attached to said Contract is hereby deleted and the attached "Amended Exhibit A" is substituted therefor.

It is expressly agreed that this Amendment is supplemental to the original Employment Contract of January 1, 2009, which is made a part hereof by reference, and all terms, conditions, and provisions of said original Contract, unless specifically modified hereby, are made a part hereof as though expressly incorporated and included herein.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the date and year first above written.

Recommended:

_____
Michael R. Gundy
Head Football Coach

COACH

_____
Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

_____
Mike Holder, Vice President for
Athletic Programs and Director of
Intercollegiate Athletics

By: _____
V. Burns Hargis
President

EXHIBIT B

139

Financial Incentives

Assistant Coach

(Amended Exhibit A)

## Overall Performance Incentives

| Category | Base Amount |
| --- | --- |

Championship

| National Championship | $20,000.00 |
| --- | --- |
| Big 12 Championship | $10,000.00 |
| Big 12 South Championship | $ 5,000.00 |

Final National Ranking – CNN/USA Today Poll

| Top 10 | $5,000.00 |
| --- | --- |
| 11-15 | $3,000.00 |
| 16-25 | $2,000.00 |

Post Season Bowl Game Participation

| BCS Bowl | Up to 2 months total compensation (salary plus talent) as determined by the Athletic Director |
| --- | --- |
| All Others | Up to 1 month total compensation (salary plus talent) as determined by the Athletic Director |

The incentive payments shall be made in January according to the highest level achieved in each category. Thus, only one payment per category is applicable. **The decision of the Athletic Director shall be final as to any interpretations or disputes pertaining to these financial incentives.**

## SECOND AMENDMENT
## TO
## EMPLOYMENT CONTRACT

This Second Amendment is hereby entered into effective this 1st day of January, 2012, to that certain Employment Contract dated January 1, 2009, between Oklahoma State University and Gregory Joe Wickline.

IN CONSIDERATION of the performance of the covenants and conditions contained herein and in the said Employment Contract dated January 1, 2009, as subsequently amended by a First Amendment thereto, the parties hereto agree that said Employment Contract is hereby amended in the following respects only:

- The date set forth in Paragraph 1.(i) of said Employment Contract is changed to December 31, 2016; and

- Subject to the exceptions allowing release in Section 11, the referenced percentage for calculating liquidated damages payable by Coach to University shall be one hundred percent (100%) in the event Coach accepts employment by a member institution of the Big Twelve Conference.

It is expressly agreed that this Second Amendment is supplemental to the original Employment Contract of January 1, 2009, and First Amendment thereto, which are made a part hereof by reference, and all terms, conditions, and provisions of said original Contract, and First Amendment thereto, unless specifically modified hereby, are made a part hereof as though expressly incorporated and included herein.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment on the date and year first above written.

Recommended:

_____
Michael R. Gundy
Head Football Coach

COACH

_____
Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

_____
Mike Holder, Vice President for
Athletic Programs and Director of
Intercollegiate Athletics

By:_____
V. Burns Hargis
President

# EXHIBIT C

141



March 24, 2014

Joe Wickline
Texas Football Offices
2012 Robert Dedman Drive
Austin, TX 78712

Re:     Employment Contract – Oklahoma State University

Dear Joe:

Because of our friendship, which I value, this letter is difficult to write. However, as a fellow Athletic Professional, you know that it is one that I must write.

A few weeks ago, you unilaterally and voluntarily terminated your employment contract (the Contract) with Oklahoma State University (OSU). The Contract contains a clause which obligates you to pay liquidated damages to OSU for such a voluntary termination. As you know, because of the significant investment OSU made in you as an assistant coach and because of the known, but difficult to calculate, damages OSU would incur in finding, relocating and training a replacement coach, that clause was intended to compensate OSU should you leave for a lateral position. However, you and OSU agreed those liquidated damages would be waived if you left OSU for a promotion to become a head coach at another NCAA Division I-A university. Accordingly, the Contract was initially phrased:

> *"University agrees to release Coach from his obligations under the Contract upon his request in order to enable him to assume employment as a Head Football Coach at a NCAA Division I-A institution..."*

Subsequently, the Contract was amended in an attempt to accommodate another potential promotion. Because an Offensive Coordinator (the primary assistant in charge of the entire offense) would ordinarily have attendant play calling duties, the Contract was amended as follows:

> *"That in addition to employment as a Head Football Coach, Coach shall also be released from the obligation to pay liquidated damages upon assumption of employment as an Offensive Coordinator (with play calling duties) at a NCAA Division 1-A Institution..."*

Upon your departure from OSU, you advised you had accepted a position at another university as the Offensive Coordinator with "play calling duties."



Athletics Center • Home of Historic Gallagher-Iba Arena • Stillwater, OK 74078-5070

142

Regrettably, it has come to our attention that neither of those statements is apparently accurate. You are apparently subordinate to not only the Head Coach at your new school, but also to the Assistant Head Coach for Offense. Thus, it appears that your current job is commensurate with your previous job title here as an assistant coach. As you know, when you signed your Contract with OSU, it was not the intent of the parties to waive the liquidated damages clause for such a lateral move.

Further, it has now come to our attention that you **do not** have "play calling duties." Instead, it appears that your Head Coach has confirmed that Shawn Watson, not you, will be calling the plays. Thus, in reality it appears you unilaterally and voluntarily terminated the Contract to make a lateral move and as such a waiver of the liquidated damages clause of the Contract is not triggered.

While OSU wishes you every success in your endeavors and burgeoning career, it is paramount to OSU that contract terms be taken seriously and that they be strictly enforced in the interest of professionalism. Accordingly, OSU will insist upon payment of the liquidated damages clause of the Contract. Those damages are equal to one hundred percent (100%) of the sum of the gross base monthly salary in effect on the date of termination and remaining under the term of the Contract, but for your termination. OSU has calculated that amount at $593,478, which is now due and payable.

We appreciate your attention to this matter and look forward to receipt of your payment. If you would like to discuss this matter further, please contact me at 405-744-7231.

Sincerely,

Mike Holder
Vice President for Athletic Programs
Director of Intercollegiate Athletics

cc:    Steve Stephens, Esq.



**BOARD OF    REGENTS**

REGENTS FOR THE

# Oklahoma State University

AND

## Agricultural and Mechanical Colleges

Office of Legal Counsel

April 22, 2014

Mr. Joe Wickline
Texas Football Offices
2012 Robert Dedman Drive
Austin, TX 78712

**PERSONAL & CONFIDENTIAL**

**VIA UPS NEXT DAY AIR**

Re:   Employment Contract - Oklahoma State University

Mr. Wickline:

On March 25, 2014 you were sent via overnight courier the enclosed letter in which Oklahoma State University (OSU) explained your obligations and made demand for payment under the liquidated damages clause of your employment contract.

As of the date of this letter, you have failed to respond. As provided for under the terms of your employment contract, you are hereby given thirty (30) days notice, upon the expiration of which, we are prepared to file the enclosed Petition in the District Court of Payne County Oklahoma. As provided for in your contract, we hope to use this period to engage in good faith negotiations aimed at resolving this dispute without litigation. Should you be interested in opening that dialogue, please have your attorney contact me.

We appreciate your prompt attention to this matter.

Sincerely,

Steve Stephens
General Counsel

SRS/jap/cp
Enclosures
cc:   Gary Clark, Esq.
      Mike Holder
      Jason Lewis

STUDENT UNION BUILDING / OKLAHOMA STATE UNIVERSITY / STILLWATER, OK 74078-7044
Telephone (405) 744-6494 / Fax (405) 744-7998

144

No. 03-15-00077-CV

# IN THE COURT OF APPEALS FOR THE
# THIRD JUDICIAL DISTRICT OF TEXAS
# AT AUSTIN, TEXAS

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

# TAB 6

CAUSE NO. D-1-GN-14-004391

| | | |
|---|---|---|
| GREGORY JOE WICKLINE, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| THE BOARD OF REGENTS FOR THE | § | |
| OKLAHOMA AGRICULTURAL AND | § | |
| MECHANICAL COLLEGES, acting for and on | § | TRAVIS COUNTY, TEXAS |
| behalf of Oklahoma State University, and JAMES | § | |
| MICHAEL HOLDER, in his individual capacity | § | |
| and in his capacity as Vice President for Athletic | § | |
| Programs and Director of Intercollegiate Athletics | § | |
| for Oklahoma State University | § | |
| | § | |
| Defendants, | § | 98TH JUDICIAL DISTRICT |
| | § | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW **Gregory Joe Wickline** ("Coach Wickline") and hereby files this Original Petition against **The Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University** ("OSU") and **James Michael Holder** ("Holder") (collectively, the "Defendants"), and would show the Honorable Court the following:

### I. DISCOVERY LEVEL

1.      Discovery in this case is intended to be conducted according to a Level III discovery control plan under Rule 190.4 of the Texas Rules of Civil Procedure.

### II. THE PARTIES

2.      Plaintiff Wickline is an individual residing in Travis County, Texas.

3.      Upon information and belief, Defendant OSU is a public educational institution organized under the constitution and laws of the State of Oklahoma, which conducts business in

3

the State of Texas, but does not maintain a resident agent for service of process in the State of Texas. Pursuant to Section 17.044 of the Texas Civil Practice & Remedies Code, OSU may be served with process as follows:

Oklahoma State University
c/o Office of the Secretary of State
Statutory Documents Section - Citations Unit
P.O. Box 12079
Austin, Texas 78711-2079

The Secretary of State is requested to forward the citation to Defendant Oklahoma State University, attention General Counsel Steve Stephens, at its principal place of business:

Oklahoma State University
c/o Steve Stephens, General Counsel
5th Floor – Student Union
Stillwater, OK 74078-7044

4.      Upon information and belief, Defendant Holder is an individual residing in Oklahoma and the Vice President for Athletic Programs and Director of Intercollegiate Athletics for OSU, who conducts business in the State of Texas, but does not maintain a resident agent for service of process in the State of Texas. Pursuant to Section 17.044 of the Texas Civil Practice & Remedies Code, Holder may be served with process as follows:

Mike Holder
c/o Office of the Secretary of State
Statutory Documents Section - Citations Unit
P.O. Box 12079
Austin, Texas 78711-2079

The Secretary of State is requested to forward the citation to Defendant Holder at his principal place of business:

Mike Holder
202 Athletics Center
Oklahoma State University
Stillwater, OK 74078

2

## III. JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over OSU, which purposefully availed itself of the privileges and benefits of conducting business in Texas. Defendants' wrongful acts that form the basis of Coach Wickline's claims in this petition occurred in Travis County, Texas.

6.      The damages sought in this cause of action are within the minimum jurisdictional limits of this Court.

7.      Venue is proper in Travis County, Texas, because all or substantially all of the events giving rise to Coach Wickline's claims occurred in Travis County. TEX. CIV. PRAC. & REM. CODE § 15.002(1). In the unlikely event Section 15.002(1) is not applicable, venue is proper in Travis County because Coach Wickline resides in Travis County and did so at the time of the accrual of his causes of action against Defendants.

## IV. FACTS

8.      On or around January 2014, Coach Wickline was offered and accepted the position of Offensive Coordinator for the University of Texas at Austin's ("UT") football team. UT is an NCAA Division I-A institution. He and UT entered into an employment contract shortly thereafter (the "UT Contract").

9.      As the Offensive Coordinator, part of Coach Wickline's duties is to call plays for UT's offense. Prior to accepting his position at UT, he was the Offensive Line Coach for OSU's football team.

10.     However, Coach Wickline's employment contract with OSU provides that OSU will release Coach Wickline from the OSU Contract and any liability for liquidated damages, or otherwise, if Coach Wickline is offered and accepts a position as the "Offensive Coordinator (with play calling duties) at another NCAA Division I-A institution." UT is such an institution

3

and Coach Wickline continues to be UT's Offensive Coordinator and continues to have "play calling duties."

11. Defendants, however, had no intention of letting their star Offensive Line Coach go to UT. Indeed, shortly before UT offered Coach Wickline the Offensive Coordinator position, Defendant Holder told Coach Wickline that he would never release him from the OSU Contract because he was "the best offensive line coach in the country."

12. Despite knowing that OSU was required to release Coach Wickline from the OSU Contract and any obligation to pay liquidated or other damages, Defendants immediately began harassing and intimidating Coach Wickline with false allegations for the purpose of interfering with his ongoing employment with UT and his UT Contract.

13. On March 24, 2014, Holder sent a letter to Coach Wickline's UT office demanding that he immediately pay $593,478 in liquidated damages to OSU—an amount that exceeds Coach Wickline's current yearly salary as UT's Offensive Coordinator. In that letter, Holder falsely claimed that Coach Wickline was not hired as UT's Offensive Coordinator and did not have "play calling duties."

14. Less than a month later, OSU sent another letter to Coach Wickline's UT office— this time attaching a draft lawsuit petition against Coach Wickline for the same amount plus interest, attorney's fees, and costs.

15. In response, Coach Wickline explained to OSU what it already knew: he was hired by UT as the Offensive Coordinator and that he, in fact, did have play calling duties.

16. On May 6, 2014, OSU sent yet another letter to Coach Wickline's UT office. OSU not only claimed that Coach Wickline was lying about his position and duties at UT, but also alleged that UT was "attempting to aid" Coach Wickline in "avoiding the terms" of the OSU Contract by providing Coach Wickline with the "misleading title of Offensive Coordinator."

4

17. On information and belief, OSU has filed a lawsuit in Oklahoma against Coach Wickline for liquidated and other damages. The lawsuit is baseless and its sole purpose is to interfere with Coach Wickline's ongoing employment relationship with UT and the UT Contract.

## V. CAUSES OF ACTION

## TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT

## AGAINST BOTH DEFENDANTS

18. Coach Wickline restates and incorporates the allegations set forth in Paragraphs 1–16 as set forth fully herein.

19. As described above, through its campaign of harrassment, threats, and intimidation, Defendants have willfully and intentionally interfered with Coach Wickline's valid employment contract with UT.

20. As a direct and proximate cause of Defendants' tortious interference, Coach Wickline has suffered injury and mental anguish. The total amount of Coach Wickline's damages, excluding interest, is within the minimum jurisdictional limits of this Court.

## DECLARATORY JUDGMENT ACTION AGAINST OSU

21. Coach Wickline restates and incorporates the allegations set forth in Paragraphs 1–20 as set forth fully herein.

22. OSU contends the contractual phrase "Offensive Coordinator (with play calling duties)" means something other than the plain and ordinary meaning of those words. According to Coach Wickline's contract with UT, he is UT's Offensive Coordinator and he has play calling duties. Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Coach Wickline requests a declaratory judgment construing this phrase according to its plain and ordinary meaning, consistent with the parties' intent, and declaring the rights and obligations of the parties accordingly.

5

23.     Coach Wickline also requests an award of reasonable and necessary attorney's fees and costs, pursuant to Texas Civil Practice & Remedies Code § 37.009.

## VI. JURY DEMAND

24.     Pursuant to Rules 216 of the Texas Rules of Civil Procedure, Coach Wickline hereby requests a jury trial and tenders its fee in support of that request. Coach Wickline requests that this cause be placed on the Court's Jury Docket.

## VII. PRAYER

25.     WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for Coach Wickline against Defendants for damages in a reasonable amount within the jurisdictional limits of the Court, and declaring the parties' rights and obligations under the OSU Contract, together with pre-judgment interest (from the date of the injury through the date of judgment, at the maximum rate allowed by law), post-judgment interest at the legal rate, attorney's fees, costs of court, and such other and further relief to which Coach Wickline may be entitled at law or in equity.

Respectfully submitted,

BECK REDDEN, LLP

By:     */s/ David J. Beck*
        David J. Beck
        State Bar No. 00000070
        1221 McKinney Street, Suite 4500
        Houston, Texas 77010
        Tel: 713-951-3700
        Fax: 713-951-3720
        Email: dbeck@beckredden.com
               ggannaway@beckredden.com

        Christopher R. Cowan
        State Bar No. 24084975

6

515 Congress Avenue, Suite 1750
Austin, Texas 78701
Tel: 512-708-1000
Fax: 512-708-1002
Email: ccowan@beckredden.com

Karson K. Thompson
State Bar No. 24083966
515 Congress Avenue, Suite 1750
Austin, Texas 78701
Tel: 512-708-1000
Fax: 512-708-1002
Email: kthompson@beckredden.com

**ATTORNEYS FOR PLAINTIFF**
**GREGORY JOE WICKLINE**

7

No. 03-15-00077-CV

# IN THE COURT OF APPEALS FOR THE
# THIRD JUDICIAL DISTRICT OF TEXAS
# AT AUSTIN, TEXAS

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

# TAB 7

Cause No. D-1-GN-14-004391

| | | |
|---|---|---|
| GREGORY JOE WICKLINE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| BOARD OF REGENTS for the Oklahoma | § | |
| Agricultural and Mechanical Colleges, | § | OF TRAVIS COUNTY, TEXAS |
| acting for and on behalf of Oklahoma State | § | |
| University; and JAMES MICHAEL | § | |
| HOLDER, in his individual capacity and in | § | |
| his capacity as Vice President for Athletic | § | |
| Programs and Director of Intercollegiate | § | |
| Athletics for Oklahoma State University, | § | |
| | § | |
| *Defendants.* | § | 98TH JUDICIAL DISTRICT |

## DEFENDANT BOARD OF REGENTS' SPECIAL APPEARANCE AND, SUBJECT THERETO, MOTION TO DISMISS BASED ON MANDATORY FORUM-SELECTION CLAUSE, MOTION TO STAY, PLEA TO THE JURISDICTION, AND ORIGINAL ANSWER

Defendant, Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University (OSU), files this (i) special appearance and, subject thereto, (ii) motion to dismiss based on a mandatory forum-selection clause, (iii) motion to stay, (iv) plea to the jurisdiction, and (v) original answer to the claims of Plaintiff Gregory Joe Wickline in the above-styled and numbered cause, and, pursuant thereto, would respectfully show as follows:

### I. SPECIAL APPEARANCE

1. This special appearance is filed prior to any other plea, pleading, or motion on behalf of OSU.

10

2.     OSU makes this special appearance to object to the entire proceeding and all claims made against it by Mr. Wickline.

3.     This Court does not have jurisdiction over OSU or its property because neither OSU nor its property is amenable to process issued by the courts of the State of Texas.

4.     Texas courts do not have jurisdiction over nonresident defendants unless they have purposefully established "minimum contacts" with Texas and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice."[1]

5.     Under a minimum-contacts analysis, Texas courts must determine whether the nonresident defendants have purposefully availed themselves of conducting activities within the State of Texas.[2]  Minimum contacts are not established unless a court finds it has either specific or general jurisdiction over each defendant.[3]

6.     Specific jurisdiction can be exercised only if a nonresident defendant's activities were "purposefully directed" to Texas *and* the litigation resulted from alleged injuries that "arise out of" or "relate to" those activities.[4]

7.     General jurisdiction cannot be exercised unless there are continuous and systematic contacts between the nonresident defendant and the State of Texas.[5]

---

[1] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

[2] *CSR Ltd. v. Link*, 925 S.W.2d 591, 596 (Tex. 1996); *Guardian Royal*, 815 S.W.2d at 226.

[3] *Guardian Royal*, 815 S.W.2d at 227.

[4] *Nat'l Indus. Sand. Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex. 1995); *Schlobohm v. Shapiro*, 784 S.W.2d 355, 258 (Tex. 1990); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Guardian Royal*, 815 S.W.2d at 227.

[5] *Guardian Royal*, 815 S.W.2d at 230; *Siskind v. Villa Found. For Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982); *Helicopteros*, 466 U.S. at 416.

8.     This Court does not have specific jurisdiction over OSU because it did not purposefully direct any activities to Texas, and Mr. Wickline's alleged causes of action do not arise out of or relate to any real or alleged contacts with Texas by OSU.[6]

9.     OSU's contacts with the State of Texas, if any, are fortuitous, and do not arise out of or relate to the operative facts of this lawsuit. Specific jurisdiction must be based on contact with the forum state "result[ing] from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others."[7]

10.    This Court also does not have general jurisdiction over OSU because it does not have continuous or systematic contacts with Texas, as evidenced by the fact OSU:

a.  is not a resident of Texas, and has never been a resident of Texas;
b.  has never maintained, and does not now maintain, a registered agent for service in Texas;
c.  does not owe and has never owed taxes to the State of Texas;
d.  does not maintain and has never maintained bank accounts in Texas;
e.  has not undertaken any purposeful activities in Texas in relation to Mr. Wickline's claims; and
f.  has committed no torts, in whole or part, within the state of Texas, and has committed no act in the State of Texas in connection with the facts giving rise to this lawsuit.

11.    No issue in this lawsuit "arises out of" or "relates to" any "purposeful activity" of OSU in the State of Texas and, therefore, the exercise of either specific or general jurisdiction over OSU in this action is not justified.[8]

---

[6] See Shell Compania Argentina De Petroleo, S.A. v. Reef Exploration, Inc., 84 S.W.3d 830, 837 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("Specific jurisdiction is established if the defendant's alleged liability arises from, or is related to, an activity conducted within the forum.").

[7] Guardian Royal, 815 S.W.2d at 227–28.

[8] See CSR Ltd., 925 S.W.2d at 595 ("defendant must take an action 'purposefully directed toward the forum state' to be subject to the jurisdiction of its courts") (emphasis in original); Guardian Royal, 815 S.W.2d at 226-27 (explaining that a party must have fair warning that its activity will subject it to the jurisdiction of the forum).

- 3 -

12. Accordingly, not only would the exercise of jurisdiction over OSU be unreasonable, it would violate traditional notions of fair play and substantial justice and OSU's due process rights under the United States Constitution and the constitution of the State of Texas.

13. OSU requests that its special appearance be set for hearing on notice to Mr. Wickline, and that upon such hearing its special appearance be sustained and the entire proceeding against it be dismissed for want of jurisdiction.

14. OSU reserves the right to amend its special appearance or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## II.    MOTION TO DISMISS BASED ON MANDATORY FORUM-SELECTION CLAUSE

15. In the alternative, and subject to and without waiver of its special appearance, OSU moves to dismiss this case based on a mandatory forum-selection clause.

16. The employment contract between Mr. Wickline and Oklahoma State University, executed January 1, 2009, (the Contract) contains a mandatory forum-selection clause in Section 14: "[a]ny action to enforce any of the provisions of this Agreement shall be filed in Payne County District Court."[9]

17. Because all of Mr. Wickline's claims against OSU fall within the scope of this mandatory forum-selection clause, OSU moves to dismiss Mr. Wickline's claims without prejudice to his making them in the District Court of Payne County, Oklahoma, where a first-filed lawsuit contains what Mr. Wickline himself has conceded are "the same issues as in this case." (More details on the first-filed lawsuit are set out below.)

---

[9] *See* Employment Contract between Mr. Wickline and OSU (Jan. 1, 2009), at ¶ 14, attached as Exhibit A. Two subsequent amendments to that contract are attached as Exhibits B and C.

- 4 -

18. OSU requests that its motion to dismiss based on a mandatory forum-selection clause be set for hearing on notice to Mr. Wickline, and that upon such hearing its motion be granted and the entire proceeding against it be dismissed.

19. OSU reserves the right to amend its motion to dismiss based on a mandatory forum-selection clause or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## III. MOTION TO STAY

20. In the alternative, and subject to and without waiver of its special appearance and motion to dismiss based on a mandatory forum-selection clause, OSU moves to stay this proceeding because a first suit involving the same subject matter was filed in the District Court of Payne County, Oklahoma, before this second lawsuit was filed.

21. OSU filed suit for breach of contract against Mr. Wickline in the District Court of Payne County, Oklahoma, on October 17, 2014.

22. Three days later, Mr. Wickline filed this second lawsuit against OSU and Mr. Holder, requesting declaratory relief and—in what appears to be an attempt to artfully plead a way to stay in Texas court—alleging tortious interference with existing contractual relations.

23. This lawsuit involves the same subject matter as the first-filed Oklahoma lawsuit, and the parties can seek all the relief they seek in this lawsuit in the Oklahoma lawsuit. In fact, Mr. Wickline has already answered and filed motions seeking substantive relief in the first-filed Oklahoma lawsuit.

24. Texas courts are "strongly urged" to stay their own proceedings when a suit in another jurisdiction concerning the same subject matter is already pending.[10]

---

[10] *See In re State Farm Mut. Auto. Ins. Co.*, 192 S.W.3d 897, 901 (Tex. App.—Tyler 2006, pet. dism'd).

- 5 -

25.    OSU requests that its motion to stay be set for hearing on notice to Mr. Wickline, and that upon such hearing its motion be granted and the entire proceeding against it be dismissed or stayed until proceedings in the Oklahoma lawsuit have terminated.

26.    OSU reserves the right to amend its motion to stay or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## IV.    PLEA TO THE JURISDICTION

27.    In the alternative, and subject to and without waiver of its special appearance and motion to dismiss or stay, OSU asserts a plea to the jurisdiction because all or part of Mr. Wickline's claims are barred by the State of Oklahoma's sovereign immunity.

28.    Under the Oklahoma Governmental Tort Claims Act (GTCA), Mr. Wickline was required to present his claims to the political subdivision that caused his alleged loss within one year of the date of the alleged loss.[11]  Only if his claims are denied is he permitted to pursue remedies in court.[12]  Because he has failed to follow this process, all or part of Mr. Wickline's claims are barred.[13]

29.    The GTCA also states a governmental entity is exclusively liable for any alleged tort claims against its employees who are acting within the scope of their employment.[14]  "Scope of employment" means "performance by an employee acting in good faith within the duties of the employee's office or employment…"[15]  The letters and other communications by Mr. Holder referenced in Mr. Wickline's original petition were taken within the scope of his employment as

---

[11] OKLA. STAT. tit. 51, § 156.A–B (2006).

[12] OKLA. STAT. tit. 51, § 157.B (2006).

[13] *See* OKLA. STAT. tit. 51, § 157.B (2006).

[14] OKLA. STAT. tit. 51, § 163.C (2006).

[15] OKLA. STAT. tit. 51, § 152(9) (2006).

- 6 -

Vice President for Athletic Programs and Director of Intercollegiate Athletics for Oklahoma State University, and Mr. Wickline's original petition does not allege otherwise. Accordingly, any claims against Mr. Holder, in place of or in addition to claims against OSU, are barred.

30. OSU reserves the right to amend its plea to the jurisdiction or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## V. GENERAL DENIAL

31. Under Rules 83–85 and 92 of the Texas Rules of Civil Procedure and other applicable law, OSU generally denies each and every allegation contained in Mr. Wickline's original petition, as well as any allegations contained in any subsequent amendments or supplements thereto, and demands that Mr. Wickline prove each and every allegation contained therein as required by the Constitutions and laws of the State of Texas and the United States of America.

## VI. SPECIAL EXCEPTIONS

32. OSU specially excepts to Mr. Wickline's failure to comply with Rule 47(c) of the Texas Rules of Civil Procedure. Mr. Wickline must amend his petition so as to specify the maximum amount of damages claimed, and until he does, he may not conduct any discovery in this cause.[16]

## VII. AFFIRMATIVE DEFENSES

33. The following are pleaded in the alternative, where necessary.

34. Mr. Wickline's claims are barred in whole or in part by estoppel.

35. Mr. Wickline's claims are barred in whole or in part by the equitable doctrine of laches.

---

[16] Tex. R. Civ. P. 47(d).

16

36. Mr. Wickline's claims are barred in whole or in part by the doctrine of waiver.

37. Mr. Wickline's claims are barred in whole or in part because Defendants are immune from suit.

38. Mr. Wickline's claims are barred in whole or in part because OSU had a privilege and/or legal justification for the actions about which Mr. Wickline complains.

39. Mr. Wickline's claims are barred in whole or in part because OSU's actions were protected and justified through the exercise of its own legal rights and/or a good faith claim to a colorable right, even if that claim ultimately proves to be mistaken.

40. Mr. Wickline's claims are barred in whole or in part because there was no intent to interfere by OSU.

41. Mr. Wickline's claims are barred in whole or in part because OSU has not interfered with his Texas contract.

42. Mr. Wickline's claims are barred in whole or in part because there has been no hindrance of his performance of the Texas contract by OSU.

43. Mr. Wickline's claims are barred in whole or in part because OSU has not interfered in any way that caused actual damage or loss.

44. Mr. Wickline's claims are barred in whole or in part because his own acts or omissions have caused any interference or injury he has sustained, if any.

45. OSU also reserves the right to plead and prove all counterclaims and other third-party claims, including, but not limited to, those based on the tortious conduct of Mr. Wickline, individually and in concert or conspiracy with other persons and/or entities.

- 8 -

17

## VIII. DENIAL OF CONDITIONS PRECEDENT

46.     Mr. Wickline has not complied with the requirements of the Contract in order to file suit.  Specifically, Section 14 requires Mr. Wickline to provide written notice of his intent to file suit, including an outline of complaints, at least 30 days before suit is filed.  Because Mr. Wickline has not complied with Section 14 of the Contract, he has not satisfied all conditions precedent for this suit.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, OSU respectfully requests that its special appearance be set for hearing on notice to Mr. Wickline, and that upon such hearing the special appearance be granted and the entire proceeding against it be dismissed for want of jurisdiction.

In the alternative, and subject to its special appearance, OSU respectfully requests that its motion to dismiss based on a mandatory forum-selection clause and motion to stay be set for hearing on notice to Mr. Wickline, and that upon such hearing the motions be granted and this entire proceeding against OSU be dismissed or stayed.

In the alternative, and subject to its special appearance and motions to dismiss or stay, OSU respectfully requests that this Court grant its plea to the jurisdiction.

If this cause proceeds to trial, OSU prays that Mr. Wickline take nothing by his claims and allegations, that OSU recover its costs expended on this suit, and for such other and further relief to which OSU may be justly entitled.

Dated: November 17, 2014  Respectfully submitted,

Howry Breen & Herman, L.L.P.

_____
Sean E. Breen
State Bar No. 00783715
sbreen@howrybreen.com
Randy Howry
State Bar No. 10121690
rhowry@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

*Attorneys for Defendant Board of Regents for the
Oklahoma Agricultural and Mechanical Colleges,
acting for and on behalf of Oklahoma State
University, and James Michael Holder*

| | | |
|---|---|---|
| GREGORY JOE WICKLINE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| BOARD OF REGENTS for the Oklahoma | § | |
| Agricultural and Mechanical Colleges, | § | OF TRAVIS COUNTY, TEXAS |
| acting for and on behalf of Oklahoma State | § | |
| University; and JAMES MICHAEL | § | |
| HOLDER, in his individual capacity and in | § | |
| his capacity as Vice President for Athletic | § | |
| Programs and Director of Intercollegiate | § | |
| Athletics for Oklahoma State University, | § | |
| | § | |
| *Defendants.* | § | 98TH JUDICIAL DISTRICT |

---

## VERIFICATION OF JAMES MICHAEL HOLDER

---

| | |
|---|---|
| STATE OF OKLAHOMA | § |
| | § |
| COUNTY OF PAYNE | § |

Before me, the undersigned authority, this day personally appeared James Michael Holder, who, being by me duly sworn, deposed as follows:

1.     "My name is James Michael Holder. I am of over 18 years old, of sound mind, and competent to make this affidavit. I am authorized to execute this affidavit on behalf of the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University.

2.     I have read the special appearance of the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Oklahoma State University, and, subject thereto, its motion to dismiss based on a mandatory forum-selection clause, motion to stay, plea to the jurisdiction, and original answer. The factual matters stated therein are within my personal knowledge, or information obtained in the course of my regular duties, and are true and correct.

3.     The documents attached to this special appearance as Exhibits A, B, and C are the original records or exact duplicates of the original records.

- 11 -

20

4.      I am, and was at the time Exhibits A, B, and C were created, an employee of Oklahoma State University (OSU), and I have personal knowledge of the manner in which those records were prepared. Those 14 pages of documents are kept by OSU in the regular course of its business. It was the regular course of business of OSU for an employee or representative of OSU—with knowledge of the act, event, condition, opinion, or diagnosis recorded—to make those documents or to transmit information to be included in those documents. Each document was made at or near the time of the act, event, condition, opinion, or diagnosis recorded, or reasonably soon thereafter. Each document was made by a person with knowledge of the act, event, condition, opinion, or diagnosis recorded, or by information transmitted by a person with such knowledge."

Further affiant sayeth not.

James Michael Holder

SWORN TO AND SUBSCRIBED before me on this _17th_ day of November, 2014.

My commission expires: 8/12/2016

NOTARY PUBLIC IN AND FOR THE
STATE OF OKLAHOMA

MARY E. HUFNAGEL
Notary's printed name

- 12 -

21

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on November 17, 2014, in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure, to the parties listed and in the manner indicated below:

David J. Beck
dbeck@beckredden.com
BECK REDDEN, LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel. (713) 951-3700
Fax (713) 951-3720

Christopher R. Cowan
ccowan@beckredden.com
Karson K. Thompson
kthompson@beckredden.com
BECK REDDEN, LLP
515 Congress Avenue, Suite 1750
Austin, Texas 78701
Tel. (512) 708-1000
Fax (512) 708-1002

*Attorneys for Plaintiff Gregory Joe Wickline*

✓ Electronic service
☐ In person
☐ Registered mail, return receipt requested
☐ Commercial delivery service
☐ Facsimile
✓ Electronic mail

Sean E. Breen

22

EMPLOYMENT CONTRACT

This Agreement, made by and between OKLAHOMA STATE UNIVERSITY, hereinafter referred to as the "University", and Gregory Joe Wickline, hereinafter referred to as "Coach";

WITNESSETH:

WHEREAS, University requires the services of an Assistant Coach for the University's Intercollegiate Football Team; and

WHEREAS, Gregory Joe Wickline meets the University's qualifications for the position and has been employed as such by University pursuant to an Employment Contract and Amendments thereto all of which the parties intend to cancel and replace by this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the University and the Coach agree as follows:

1. Subject to the conditions stated in the provisions of this agreement, the University hereby employs Coach as Assistant Coach for the University's Intercollegiate Football Team at Oklahoma State University for a designated period beginning with the 1st day of January, 2009 and ending on the first to occur of any of the following: (i) December 31, 2013; (ii) 180 days following the resignation of the Head Football Coach; or (iii) termination of this Contract as otherwise provided herein. The Coach hereby agrees to and does accept the terms and conditions for said employment for the designated period. Neither this Contract nor Coach's employment hereunder shall in any way grant the Coach a claim to tenure in employment, or any years of employment attributable to tenure within the University.

2. The compensation paid by the University to the Coach for services and satisfactory performance of the conditions of this Contract shall be at the annual salary rate of $157,500.00 per annum payable in monthly installments out of legally available funds by the University to the Coach on the last day of each calendar month during the term of this Contract. In addition, Coach shall

1

23

receive from legally available funds bonuses earned, if any, based on the performance incentives attained in the football season of the then current fiscal year in accordance with "Exhibit A" entitled "Financial Incentives," attached hereto and made a part hereof. It is agreed that the compensation so paid shall be subject to the same payroll deductions (for example, state and federal taxes, F.I.C.A. withholding, and retirement plans) that apply to University administrative and professional (A&P) employees. The Coach shall be eligible to participate in group insurance and retirement programs and voluntary payroll deduction programs on the same basis, and with the same employer contributions, that apply to University administrative and professional (A&P) employees.

3. The Coach shall devote his full time and attention to such duties and responsibilities as an Assistant Coach as assigned by and serving under the direction of the University's Head Football Coach. The Coach shall conduct such travel as is necessary to carry out his duties and the Coach shall be entitled to reimbursement for transportation and per diem expenses at the maximum rate authorized by law and University regulations.

4. The Coach shall recognize and comply with the policies, rules, and regulations of and governing Oklahoma State University and its employees and the rules of the Big Twelve Conference and the National Collegiate Athletic Association, as now constituted or as any of the same may be amended during the term hereof.

Coach shall respond, and shall not counsel or instruct any coach, student, or any other person to fail to respond, accurately and fully within a reasonable time to any reasonable request or inquiry relating to the performance of his duties hereunder or the performance of his duties during his prior employment at any other institution of higher learning propounded by University, NCAA, the Big Twelve Conference or other governing body having supervision over the athletic programs of University or such other institution of higher learning, or required by law, governing athletic rules or University policies and regulations.

Without limitation upon any right or remedy of the University in the event the Coach breaches this Contract, it is specifically agreed that if the

2

24

University finds after due hearing that the Coach is, has been, or was at any time, involved in violations of the NCAA legislation applicable to University or to any prior employer of the Coach which was at the time of such employment a member of NCAA, it may take one or more of the following actions that it deems appropriate: (1) termination of employment; (2) suspension, with or without pay, for a period of time as the University shall determine; (3) modification of duties; or (4) reassignment to other employment duties within the University.

Coach shall indemnify the University for all costs (including attorney fees) incurred by University in responding to any official inquiry of the NCAA resulting in a show cause penalty against the Coach by the Infractions Committee.

5. Coach shall conduct himself with due regard to public convention and morals, shall not do any act that will tend to degrade him in society or bring him into public hatred, contempt, scorn, or ridicule, or that will tend to shock, or insult the community or offend public morals or decency, and he shall not do any act that tends to impair his capacity to fully comply with his obligations hereunder.

6. Coach recognizes that University has assigned a high priority to the academic achievement of the students who participate in its athletic programs and that it is the expectation of the President and the Board of Regents that Coach will emphasize the importance of academic achievement to the students who are athletes at the University. Coach shall maintain a cooperative relationship with Academic Services for Student-Athletes in order to assure student-athletes are offered every opportunity to achieve academic expectations and success.

7. Coach shall comply fully with all NCAA, Conference, and institutional regulations governing outside employment and compensation.

Any television, radio, consultant, endorsement, or outside employment agreement or contract of any nature as well as all other activities related to Coach's involvement in University athletics will be under the supervision, direction, and control of the Athletic Director. All such arrangements and activities must first be approved annually in writing by the Athletic Director and shall not conflict with the best interest of the University.

3

Coach must receive annually prior written approval from the President for all athletically related income and benefits from sources outside the institution, including but not limited to income from gifts to Coach from donors or from friends of the Athletic Department; annuities; sports camps; housing benefits (including preferential arrangements); country club memberships; complimentary ticket sales; television and radio programs; and endorsements or consultation contracts with athletics shoe, apparel, or equipment manufacturers.

It is specifically understood that Coach shall not use, directly or by implication, the name of the University or its logos in the endorsement of commercial products or services for personal gain without the prior written approval of the President.

8. The University reserves the right to either terminate this Contract, or to suspend the Coach for a period of time from performance of duties with or without pay without termination of this Contract for cause, including but not limited to any of the following : (1) the University has a reasonable basis for believing Coach has been involved in deliberate and significant or repetitive violations of Provision No. 4 of this Agreement, or (2) failure of Coach to comply with any of the provisions set forth in Provision Nos. 5 or 11 of this Agreement, or (3) any conduct of Coach in violation of any criminal statute (excluding minor traffic offenses) whether prosecuted or not, or any act of moral turpitude, or (4) violations by Coach of any of the other terms of this Agreement which cannot be or has not been remedied after thirty (30) days written notice thereof to Coach, or (5) conduct of Coach determined by the University to be seriously prejudicial to its best interests or the best interests of its athletic program, or (6) material misrepresentation of Coach's educational or other qualifications for employment as Coach hereunder, or (7) fraud or dishonesty of Coach in the performance of his duties or responsibilities under this Agreement, or (8) use or consumption by Coach of alcoholic beverages, drugs, controlled substances, steroids or other chemicals in such degree and for such appreciable period as to impair significantly or materially his ability to perform his duties hereunder or failure by Coach to fully cooperate in the enforcement and

4

implementation of any drug testing program established by University for student-athletes, or (9) any cause adequate to sustain the termination or suspension, as the case may be, of any other University employee.

The Head Football Coach or the Director of Intercollegiate Athletics shall have the administrative authority to order suspension of the Coach from duties and salary for causes identified in this Provision No. 8, provided, that notice of any such suspension shall be provided in writing, detailing the reasons for such suspension, and setting forth a reasonable time within which Coach may respond to same. The Coach shall have the procedural right, upon his written request, for a review and hearing relative to any such suspension. Any such hearing shall be governed by the normal University grievance procedures provided for administrative and professional (A&P) employees, as now or hereafter amended, unless other procedures are agreed upon by the parties in lieu thereof.

Termination of this Contract by the University may occur only after recommendation of such action by the Head Football Coach and approval thereof by the Director of Intercollegiate Athletics. If such adverse action is to be initiated for causes identified in this Provision No. 8, the Head Football Coach shall inform Coach in writing of his preliminary intent to recommend termination before making any such formal recommendation to the Director of Intercollegiate Athletics. In such case, the Head Football Coach will inform Coach in writing of specific concerns and provide Coach a meaningful opportunity to address the concerns of the Head Football Coach within a reasonable period of time (in no event less than fifteen (15) days) before proceeding with an adverse recommendation. Any other hearing which may be permitted shall be governed by the normal University grievance procedures provided for administrative and professional (A&P) employees, as now or hereafter amended unless other procedures are agreed upon by the parties in lieu thereof.

In the event this Contract is terminated by University for cause or causes under this Provision No. 8, University's sole liability to Coach shall be limited to payment of salary or installments thereof, which may have been earned and accrued before the end of the month of such termination.

5

27

9. Notwithstanding the term of duration of this Contract as stated in Paragraph One (1) hereof, and subject to the terms of Paragraphs Ten (10) and Eleven (11) hereof, either party may terminate this Contract without particular cause by giving written notice to the other party of the terminating party's exercise of this right to terminate. Such termination shall be effective immediately upon receipt of such written notice by the other party, unless specified otherwise in said written notice.

10. In the event University terminates this Contract without cause under Paragraph Nine (9) hereof, then Coach agrees to accept liquidated damages as specified in this Section 10 in complete satisfaction of and payment in full for all obligations, if any, due and owing by University to Coach. As liquidated damages, University shall pay Coach a sum equal to the sum of the gross base monthly salary in effect on the date of termination and remaining due under Section 2 of this Contract but for termination of the Contract, payable in equal monthly installments from legally available funds until the date on which the Contract would have expired, plus any bonuses (i.e., "Financial Incentives" as set forth in "Exhibit A") earned as of the date of termination. Coach shall be responsible for all taxes thereon. Coach shall be entitled to maintain health insurance coverage, at Coach's sole expense, as provided under law.

The parties have bargained for and agreed to this liquidated damages provision and have agreed that the payment of such liquidated damages shall constitute reasonable and adequate compensation for damages that might ensue as a result of University's termination of this Contract without cause, including any loss by Coach of any collateral business opportunities or any other benefits, perquisites or income from any other sources or agreements. Said liquidated damages shall not be construed as a penalty.

Notwithstanding the foregoing, a condition precedent to the University's obligations to pay the foregoing payments is that Coach diligently seek mitigation of this payment obligation by obtaining full-time employment, business or professional income (for example, but not limited to, football coaching, media commentator, speaking engagements, teaching or other academic activities,

6

consulting or participation in business or any other income producing opportunities). Coach shall begin and shall thereafter continue making very diligent efforts to obtain such income as soon as practicable but not later than thirty (30) days following such termination and each thirty (30) days thereafter shall provide University with a written report of the specific efforts undertaken in this regard including the amount of income, if any, resulting directly or indirectly therefrom. University's financial obligation under this Contract shall cease or be reduced commensurately by the amount of any such income.

11. The Coach agrees that he will not personally or, directly or indirectly, through any agent or representative, inquire into, seek, negotiate for, or accept other full-time or part-time employment of any nature at any time during the term of this Contract without first having obtained the written permission of the Head Football Coach and the Director of Intercollegiate Athletics, which permission shall not be unreasonably withheld.

The parties hereby agree that Coach has special, exceptional, and unique knowledge, skill, and ability as a football coach which, in addition to future acquisitions of coaching experience at the University, as well as the University's special need for continuity in its Intercollegiate Football Program, will render the Coach's services unique. The Coach recognizes that the loss of Coach's services to the University, without University approval and release, prior to the expiration of the term of this Contract or any renewal thereof, would cause an inherent loss to the University which cannot be estimated with certainty, or fairly or adequately compensated by money damages.

The Coach therefore agrees, and hereby specifically promises, not to accept employment, under any circumstances, as a football coach at any institution of higher education which is a member of the National Collegiate Athletic Association, or for any football team participating in any professional league or conference in the United States or elsewhere, requiring performance of duties prior to the expiration date of the term of this Contract or any extension thereof, without first obtaining a release of this Contract, or a negotiated settlement thereof in writing accepted by the Coach and the Director of

7

29

Intercollegiate Athletics and approved by the President of the University.

In the event of Coach's termination of this Contract without cause under Paragraph Nine (9) hereof prior to its expiration date without first obtaining a release therefrom by the University, Coach shall pay to University, as liquidated damages, a sum equal to fifty percent (50%) of the sum of the gross base monthly salary in effect on the date of termination and remaining due under Section 2 of this Contract but for termination of the Contract, said sum to become due and payable within thirty (30) days of the effective date of termination of the Contract, *provided, however,* University agrees to release Coach from his obligations under the Contract upon his request in order to enable him to assume employment as a Head Football Coach at a NCAA Division I-A institution and thereafter no liquidated damages shall be payable by Coach upon his termination of the Contract without cause. The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that University will incur administrative, recruiting, resettlement, and other costs in obtaining a replacement for Coach, in addition to potentially increased compensation costs if Coach terminates this Agreement prior to its expiration, which damages are extremely difficult or impracticable to determine with certainty. The payment of said sum shall constitute adequate and reasonable compensation to the University for the damages and injury suffered because of such termination by Coach. The foregoing shall not be, nor be construed to be, a penalty.

12. The Coach shall be entitled to annual vacation or leave time and sick leave in accordance with University policies governing administrative and professional (A&P) employees; except, however, no terminal vacation leave (i.e., accrued but unused annual leave) shall be due to or claimed by Coach upon termination or separation from University employment.

13. The University, as additional compensation to Coach, shall make arrangements for the provision to Coach on a loan basis an automobile for his use. It is further agreed that University shall provide and make available to Coach appropriate gasoline credit cards for Coach's use in the performance of his

8

duties with the University pursuant to this Contract, which cards shall be available to Coach throughout the term of this Contract. The University further agrees to provide appropriate liability and comprehensive automobile insurance to cover Coach in the use and operation of said vehicle, during the term of this Contract.

14. Any action to enforce any of the provisions of this Agreement shall be filed in the Payne County District Court. No such action may be filed until the party claiming to be aggrieved shall first have delivered to the other a written notice of intention to file suit, including an outline of complaints. This notice shall be delivered at least 30 days before any suit is filed, and the parties shall use that period to engage in good-faith negotiations aimed at resolving the dispute without litigation. This paragraph is not intended to limit or circumscribe the legal rights of any party thereto, but rather to ensure that the parties exhaust all avenues of seeking a mutually agreeable accommodation of their differences before instituting litigation. In any situation where the terms of this paragraph might affect the legal rights of any party hereto, the parties shall stipulate to appropriate extensions of limitation periods and other matters to eliminate any such potential effect.

15. It is understood and agreed that this Contract shall not be effective until signed by the President of Oklahoma State University, with the recommendation of its Head Football Coach and its Director of Intercollegiate Athletics, and that no amendments, alterations, or interpretations thereof shall be binding upon the University unless so made in writing and so approved by the President.

16. The relationship between the Coach and the University shall be determined solely by the terms and conditions of this Contract and this Contract supersedes and replaces all previous agreements between the parties and amendments thereto which are hereby cancelled by mutual consent.

17. This Contract has been entered into under and shall be governed by the laws of the State of Oklahoma and any provision of this Contract prohibited by the laws of said State shall be ineffective to the extent of such prohibition

9

31

without invalidating the remaining provisions of this Contract.

18. This Contract may be amended by mutual agreement executed in writing and appended hereto. It is contemplated that any adjustments in compensation paid the Coach that may be agreed upon will be accomplished in the same manner and on the same forms as are utilized by the University for other Athletic Department and University employees.

DATED as of the 1st day of January, 2009.

Recommended:

_____
Michael R. Gundy
Head Football Coach


_____
Mike Holder, Vice President for
Athletic Programs and Director
of Intercollegiate Athletics

COACH

_____
Gregory Joe Wickline


OKLAHOMA STATE UNIVERSITY

By:_____
V. Burns Hargis
President

10

Financial Incentives

*Overall Performance Incentives*

| Category | Base Amount |
|---|---|
| **Championship** | |
| National Championship | $20,000.00 |
| Big 12 Championship | $10,000.00 |
| Big 12 South Championship | $ 5,000.00 |

**Final National Ranking – CNN/USA Today Poll**

| | |
|---|---|
| Top 10 | $5,000.00 |
| 11-15 | $3,000.00 |
| 16-25 | $2,000.00 |

**Post Season Bowl Game Participation***

| | |
|---|---|
| BCS Bowl | Up to 2 months University salary as determined by the Athletic Director |
| All Others | Up to 1 month University salary as determined by the Athletic Director |

*Post Season Bowl Incentive payments shall not be earned by or payable to Coach if he voluntarily leaves the employment of the University and/or terminates this Contract without cause prior to the official date for signing of the National Letter of Intent for the sport of football following the Bowl appearance.

The incentives will be paid according to the highest level achieved in each category. Thus, only one payment per category is applicable. *The decision of the Athletic Director shall be final as to any interpretations or disputes pertaining to these financial incentives.*

Exhibit A

33

# FIRST AMENDMENT
## TO
## EMPLOYMENT CONTRACT

This First Amendment is hereby entered into effective this 1st day of January 2011 to that certain Employment Contract dated January 1, 2009, between Oklahoma State University and Gregory Joe Wickline.

IN CONSIDERATION of the performance of the covenants and conditions contained herein and in the said Employment Contract dated January 1, 2009, the parties hereto agree that said Employment Contract is hereby amended in the following respects only:

- The annual salary set forth in Paragraph Two (2) is hereby increased to $200,000.00 beginning January 1, 2011;
- Paragraph 1.(ii) is modified to read as follows "one year following the resignation of the Head Football Coach; or";
- In Section 11 the referenced percentage for calculating liquidated damages payable by Coach to University shall be increased to seventy-five percent (75%);
- That in addition to employment as a Head Football Coach, Coach shall also be released from the obligation to pay liquidated damages upon assumption of employment as an Offensive Coordinator (with play calling duties) at a NCAA Division I-A institution or as an Assistant Coach in the NFL; and
- "Exhibit A" entitled "Financial Incentives" attached to said Contract is hereby deleted and the attached "Amended Exhibit A" is substituted therefor.

It is expressly agreed that this Amendment is supplemental to the original Employment Contract of January 1, 2009, which is made a part hereof by reference, and all terms, conditions, and provisions of said original Contract, unless specifically modified hereby, are made a part hereof as though expressly incorporated and included herein.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the date and year first above written.

Recommended:

_____
Michael R. Gundy
Head Football Coach

COACH

_____
Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

_____
Mike Holder, Vice President for
Athletic Programs and Director of
Intercollegiate Athletics

By: _____
V. Burns Hargis
President

34

## Financial Incentives
## Assistant Coach
## (Amended Exhibit A)

### Overall Performance Incentives

| Category | Base Amount |
| --- | --- |
| | |
| **Championship** | |
| National Championship | $20,000.00 |
| Big 12 Championship | $10,000.00 |
| Big 12 South Championship | $ 5,000.00 |
| | |
| **Final National Ranking – CNN/USA Today Poll** | |
| Top 10 | $5,000.00 |
| 11-15 | $3,000.00 |
| 16-25 | $2,000.00 |

**Post Season Bowl Game Participation**

| | |
| --- | --- |
| BCS Bowl | Up to 2 months total compensation (salary plus talent) as determined by the Athletic Director |
| All Others | Up to 1 month total compensation (salary plus talent) as determined by the Athletic Director |

The incentive payments shall be made in January according to the highest level achieved in each category. Thus, only one payment per category is applicable. The decision of the Athletic Director shall be final as to any interpretations or disputes pertaining to these financial incentives.

# SECOND AMENDMENT
## TO
## EMPLOYMENT CONTRACT

This Second Amendment is hereby entered into effective this 1st day of January, 2012, to that certain Employment Contract dated January 1, 2009, between Oklahoma State University and Gregory Joe Wickline.

IN CONSIDERATION of the performance of the covenants and conditions contained herein and in the said Employment Contract dated January 1, 2009, as subsequently amended by a First Amendment thereto, the parties hereto agree that said Employment Contract is hereby amended in the following respects only:

- The date set forth in Paragraph 1.(i) of said Employment Contract is changed to December 31, 2016; and

- Subject to the exceptions allowing release in Section 11, the referenced percentage for calculating liquidated damages payable by Coach to University shall be one hundred percent (100%) in the event Coach accepts employment by a member institution of the Big Twelve Conference.

It is expressly agreed that this Second Amendment is supplemental to the original Employment Contract of January 1, 2009, and First Amendment thereto, which are made a part hereof by reference, and all terms, conditions, and provisions of said original Contract, and First Amendment thereto, unless specifically modified hereby, are made a part hereof as though expressly incorporated and included herein.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment on the date and year first above written.

Recommended:

Michael R. Gundy
Head Football Coach

COACH

Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

By: _____

Mike Holder, Vice President for
Athletic Programs and Director of
Intercollegiate Athletics

V. Burns Hargis
President

36

No. 03-15-00077-CV

**IN THE COURT OF APPEALS FOR THE
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN, TEXAS**

GREGORY JOE WICKLINE,

PLAINTIFF – APPELLANT,

V.

BOARD OF REGENTS FOR THE OKLAHOMA AGRICULTURAL AND MECHANICAL
COLLEGES; AND JAMES MICHAEL HOLDER,

DEFENDANTS – APPELLEES.

# TAB 8

Cause No. D-1-GN-14-004391

| | | |
|---|---|---|
| GREGORY JOE WICKLINE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| BOARD OF REGENTS for the Oklahoma | § | |
| Agricultural and Mechanical Colleges, | § | OF TRAVIS COUNTY, TEXAS |
| acting for and on behalf of Oklahoma State | § | |
| University; and JAMES MICHAEL | § | |
| HOLDER, in his individual capacity and in | § | |
| his capacity as Vice President for Athletic | § | |
| Programs and Director of Intercollegiate | § | |
| Athletics for Oklahoma State University, | § | |
| | § | |
| *Defendants.* | § | 98TH JUDICIAL DISTRICT |

## DEFENDANT JAMES MICHAEL HOLDER'S SPECIAL APPEARANCE AND, SUBJECT THERETO, MOTION TO DISMISS BASED ON MANDATORY FORUM-SELECTION CLAUSE, MOTION TO STAY, PLEA TO THE JURISDICTION, AND ORIGINAL ANSWER

Defendant, James Michael Holder, in both his individual capacity and his official capacity as Vice President for Athletic Programs and Director of Intercollegiate Athletics for Oklahoma State University, files this (i) special appearance and, subject thereto, (ii) motion to dismiss based on a mandatory forum-selection clause, (iii) motion to stay, (iv) plea to the jurisdiction, and (v) original answer to the claims of Plaintiff Gregory Joe Wickline in the above-styled and numbered cause, and, pursuant thereto, would respectfully show as follows:

### I.    SPECIAL APPEARANCE

1.    This special appearance is filed prior to any other plea, pleading, or motion on behalf of Mr. Holder.

37

2.      Mr. Holder makes this special appearance to object to the entire proceeding and all claims made against him by Mr. Wickline.

3.      This Court does not have jurisdiction over Mr. Holder or his property because neither Mr. Holder nor his property are amenable to process issued by the courts of the State of Texas.

4.      Texas courts do not have jurisdiction over nonresident defendants unless they have purposefully established "minimum contacts" with Texas and the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice."[1]

5.      Under a minimum-contacts analysis, Texas courts must determine whether the nonresident defendants have purposefully availed themselves of conducting activities within the State of Texas.[2] Minimum contacts are not established unless a court finds it has either specific or general jurisdiction over each defendant.[3]

6.      Specific jurisdiction can be exercised only if a nonresident defendant's activities were "purposefully directed" to Texas *and* the litigation resulted from alleged injuries that "arise out of" or "relate to" those activities.[4]

7.      General jurisdiction cannot be exercised unless there are continuous and systematic contacts between the nonresident defendant and the State of Texas.[5]

---

[1] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985); *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

[2] *CSR Ltd. v. Link*, 925 S.W.2d 591, 596 (Tex. 1996); *Guardian Royal*, 815 S.W.2d at 226.

[3] *Guardian Royal*, 815 S.W.2d at 227.

[4] *Nat'l Indus. Sand. Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex. 1995); *Schlobohm v. Shapiro*, 784 S.W.2d 355, 258 (Tex. 1990); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Guardian Royal*, 815 S.W.2d at 227.

[5] *Guardian Royal*, 815 S.W.2d at 230; *Siskind v. Villa Found. For Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982); *Helicopteros*, 466 U.S. at 416.

- 2 -

8.     This Court does not have specific jurisdiction over Mr. Holder because he did not purposefully direct any activities to Texas, and Mr. Wickline's alleged causes of action do not arise out of or relate to any real or alleged contacts with Texas by Mr. Holder.[6]

9.     Mr. Holder's contacts with the State of Texas, if any, are fortuitous, and do not arise out of or relate to the operative facts of this lawsuit. Specific jurisdiction must be based on contact with the forum state "result[ing] from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others."[7]

10.     This Court also does not have general jurisdiction over Mr. Holder because he does not have continuous or systematic contacts with Texas, as evidenced by the fact Mr. Holder:

   a.   is not a resident of Texas, and has never been a resident of Texas;
   b.   has never maintained, and does not now maintain, a registered agent for service in Texas;
   c.   does not owe and has never owed taxes to the State of Texas;
   d.   does not maintain and has never maintained bank accounts in Texas;
   e.   has not undertaken any purposeful activities in Texas in relation to Mr. Wickline's claims; and
   f.   has committed no torts, in whole or part, within the state of Texas, and has committed no act in the State of Texas in connection with the facts giving rise to this lawsuit.

11.     No issue in this lawsuit "arises out of" or "relates to" any "purposeful activity" of Mr. Holder in the State of Texas and, therefore, the exercise of either specific or general jurisdiction over Mr. Holder in this action is not justified.[8]

12.     Accordingly, not only would the exercise of jurisdiction over Mr. Holder be unreasonable, it would violate traditional notions of fair play and substantial justice and Mr.

---

[6] *See Shell Compania Argentina De Petroleo, S.A. v. Reef Exploration, Inc.*, 84 S.W.3d 830, 837 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("Specific jurisdiction is established if the defendant's alleged liability arises from, or is related to, an activity conducted within the forum.").

[7] *Guardian Royal*, 815 S.W.2d at 227–28.

[8] *See CSR Ltd.*, 925 S.W.2d at 595 ("defendant must take an action 'purposefully directed toward the forum state' to be subject to the jurisdiction of its courts") (emphasis in original); *Guardian Royal*, 815 S.W.2d at 226-27 (explaining that a party must have fair warning that its activity will subject it to the jurisdiction of the forum).

- 3 -

Holder's due process rights under the United States Constitution and the constitution of the State of Texas.

13. Mr. Holder requests that his special appearance be set for hearing on notice to Mr. Wickline, and that upon such hearing his special appearance be sustained and the entire proceeding against him be dismissed for want of jurisdiction.

14. Mr. Holder reserves the right to amend his special appearance or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## II. MOTION TO DISMISS BASED ON MANDATORY FORUM-SELECTION CLAUSE

15. In the alternative, and subject to and without waiver of his special appearance, Mr. Holder moves to dismiss this case based on a mandatory forum-selection clause.

16. The employment contract between Mr. Wickline and Oklahoma State University, executed January 1, 2009, (the Contract) contains a mandatory forum-selection clause in Section 14: "[a]ny action to enforce any of the provisions of this Agreement shall be filed in Payne County District Court."[9] Mr. Holder is entitled to invoke this mandatory forum-selection clause.

17. Because all of Mr. Wickline's claims against Mr. Holder fall within the scope of this mandatory forum-selection clause, Mr. Holder moves to dismiss Mr. Wickline's claims without prejudice to his making them in the District Court of Payne County, Oklahoma, where a first-filed lawsuit contains what Mr. Wickline himself has conceded are "the same issues as in this case." (More details on the first-filed lawsuit are set out below.)

---

[9] *See* Employment Contract between Mr. Wickline and OSU (Jan. 1, 2009), at ¶ 14, attached as Exhibit A. Two subsequent amendments to that contract are attached as Exhibits B and C.

40

18.     Mr. Holder requests that his motion to dismiss based on a mandatory forum-selection clause be set for hearing on notice to Mr. Wickline, and that upon such hearing his motion be granted and the entire proceeding against him be dismissed.

19.     Mr. Holder reserves the right to amend his motion to dismiss based on a mandatory forum-selection clause or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## III.     MOTION TO STAY

20.     In the alternative, and subject to and without waiver of his special appearance and motion to dismiss based on a mandatory forum-selection clause, Mr. Holder moves to stay this proceeding because a first suit involving the same subject matter was filed in the District Court of Payne County, Oklahoma, before this second lawsuit was filed.

21.     OSU filed suit for breach of contract against Mr. Wickline in the District Court of Payne County, Oklahoma, on October 17, 2014.

22.     Three days later, Mr. Wickline filed this second lawsuit against OSU and Mr. Holder, requesting declaratory relief and—in what appears to be an attempt to artfully plead a way to stay in Texas court—alleging tortious interference with existing contractual relations.

23.     This lawsuit involves the same subject matter as the first-filed Oklahoma lawsuit, and the parties can seek all the relief they seek in this lawsuit in the Oklahoma lawsuit. In fact, Mr. Wickline has already answered and filed motions seeking substantive relief in the first-filed Oklahoma lawsuit.

24.     Texas courts are "strongly urged" to stay their own proceedings when a suit in another jurisdiction concerning the same subject matter is already pending.[10]

---

[10] *See In re State Farm Mut. Auto. Ins. Co.*, 192 S.W.3d 897, 901 (Tex. App.—Tyler 2006, pet. dism'd).

25. Mr. Holder requests that his motion to stay be set for hearing on notice to Mr. Wickline, and that upon such hearing his motion be granted and the entire proceeding against him be dismissed or stayed until proceedings in the Oklahoma lawsuit have terminated.

26. Mr. Holder reserves the right to amend his motion to stay or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## IV. PLEA TO THE JURISDICTION

27. In the alternative, and subject to and without waiver of his special appearance and motions to dismiss or stay, Mr. Holder asserts a plea to the jurisdiction because all or part of Mr. Wickline's claims are barred by the State of Oklahoma's sovereign immunity.

28. Under the Oklahoma Governmental Tort Claims Act (GTCA), Mr. Wickline was required to present his claims to the political subdivision that caused his alleged loss within one year of the date of the alleged loss.[11] Only if his claims are denied is he permitted to pursue remedies in court.[12] Because he has failed to follow this process, all or part of Mr. Wickline's claims are barred.[13]

29. The GTCA also states a governmental entity is exclusively liable for any alleged tort claims against government employees who are acting within the scope of their employment.[14] "Scope of employment" means "performance by an employee acting in good faith within the duties of the employee's office or employment..."[15] The letters and other communications by Mr. Holder referenced in Mr. Wickline's original petition were taken within the scope of his employment as

---

[11] OKLA. STAT. tit. 51, § 156.A–B (2006).

[12] OKLA. STAT. tit. 51, § 157.B (2006).

[13] See OKLA. STAT. tit. 51, § 157.B (2006).

[14] OKLA. STAT. tit. 51, § 163.C (2006).

[15] OKLA. STAT. tit. 51, § 152(9) (2006).

- 6 -

Vice President for Athletic Programs and Director of Intercollegiate Athletics for Oklahoma State University, and Mr. Wickline's original petition does not allege otherwise. Accordingly, any claims against Mr. Holder, in place of or in addition to claims against OSU, are barred.

30.     Mr. Holder reserves the right to amend his plea to the jurisdiction or file additional papers in support thereof, if and as necessary, in accordance with the Texas Rules of Civil Procedure.

## V.     GENERAL DENIAL

31.     Under Rules 83–85 and 92 of the Texas Rules of Civil Procedure and other applicable law, Mr. Holder generally denies each and every allegation contained in Mr. Wickline's original petition, as well as any allegations contained in any subsequent amendments or supplements thereto, and demands that Mr. Wickline prove each and every allegation contained therein as required by the Constitutions and laws of the State of Texas and the United States of America.

## VI.     SPECIAL EXCEPTIONS

32.     Mr. Holder specially excepts to Mr. Wickline's failure to comply with Rule 47(c) of the Texas Rules of Civil Procedure. Mr. Wickline must amend his petition so as to specify the maximum amount of damages claimed, and until he does, he may not conduct any discovery in this cause.[16]

## VII.     VERIFIED PLEAS

33.     Mr. Holder is not and cannot be held liable in his individual capacity for any of Mr. Wickline's claims.

---

[16] Tex. R. Civ. P. 47(d).

## VIII. AFFIRMATIVE DEFENSES

34. The following are pleaded in the alternative, where necessary.

35. Mr. Wickline's claims are barred in whole or in part by estoppel.

36. Mr. Wickline's claims are barred in whole or in part by the equitable doctrine of laches.

37. Mr. Wickline's claims are barred in whole or in part by the doctrine of waiver.

38. Mr. Wickline's claims are barred in whole or in part because Defendants are immune from suit.

39. Mr. Wickline's claims are barred in whole or in part because Mr. Holder had a privilege and/or legal justification for the actions about which Mr. Wickline complains.

40. Mr. Wickline's claims are barred in whole or in part because Mr. Holder's actions were protected and justified through the exercise of his own legal rights and/or a good faith claim to a colorable right, even if that claim ultimately proves to be mistaken.

41. Mr. Wickline's claims are barred in whole or in part because there was no intent to interfere by Mr. Holder.

42. Mr. Wickline's claims are barred in whole or in part because Mr. Holder has not interfered with Mr. Wickline's Texas contract.

43. Mr. Wickline's claims are barred in whole or in part because there has been no hindrance of Mr. Wickline's performance of the Texas contract by Mr. Holder.

44. Mr. Wickline's claims are barred in whole or in part because Mr. Holder has not interfered in any way that caused actual damage or loss.

45. Mr. Wickline's claims are barred in whole or in part because his own acts or omissions have caused any interference or injury he has sustained, if any.

- 8 -

44

46.     Mr. Holder also reserves the right to plead and prove all counterclaims and other third-party claims, including, but not limited to, those based on the tortious conduct of Mr. Wickline, individually and in concert or conspiracy with other persons and/or entities.

## IX.     DENIAL OF CONDITIONS PRECEDENT

47.     Mr. Wickline has not complied with the requirements of the Contract in order to file suit. Specifically, Section 14 requires Mr. Wickline to provide written notice of his intent to file suit, including an outline of complaints, at least 30 days before suit is filed. Because Mr. Wickline has not complied with Section 14 of the Contract, he has not satisfied all conditions precedent for this suit.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Mr. Holder respectfully requests that his special appearance be set for hearing on notice to Mr. Wickline, and that upon such hearing the special appearance be granted and the entire proceeding against Mr. Holder be dismissed for want of jurisdiction.

In the alternative, and subject to his special appearance, Mr. Holder respectfully requests that his motion to dismiss based on a mandatory forum-selection clause and motion to stay be set for hearing on notice to Mr. Wickline, and that upon such hearing the motions be granted and this entire proceeding against Mr. Holder be dismissed or stayed.

In the alternative, and subject to his special appearance and motions to dismiss or stay, Mr. Holder respectfully requests that this Court grant his plea to the jurisdiction.

If this cause proceeds to trial, Mr. Holder prays that Mr. Wickline take nothing by his claims and allegations, that Mr. Holder recover his costs expended on this suit, and for such other and further relief to which Mr. Holder may be justly entitled.

- 9 -

Dated: November 17, 2014          Respectfully submitted,

HOWRY BREEN & HERMAN, L.L.P.

_____
Sean E. Breen
State Bar No. 00783715
sbreen@howrybreen.com
Randy Howry
State Bar No. 10121690
rhowry@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

*Attorneys for Defendants Board of Regents for the
Oklahoma Agricultural and Mechanical Colleges,
acting for and on behalf of Oklahoma State
University, and James Michael Holder*

| | | |
|---|---|---|
| GREGORY JOE WICKLINE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| BOARD OF REGENTS for the Oklahoma | § | |
| Agricultural and Mechanical Colleges, | § | OF TRAVIS COUNTY, TEXAS |
| acting for and on behalf of Oklahoma State | § | |
| University; and JAMES MICHAEL | § | |
| HOLDER, in his individual capacity and in | § | |
| his capacity as Vice President for Athletic | § | |
| Programs and Director of Intercollegiate | § | |
| Athletics for Oklahoma State University, | § | |
| | § | |
| *Defendants.* | § | 98TH JUDICIAL DISTRICT |

---

## VERIFICATION OF JAMES MICHAEL HOLDER

---

| | |
|---|---|
| STATE OF OKLAHOMA | § |
| | § |
| COUNTY OF PAYNE | § |

Before me, the undersigned authority, this day personally appeared James Michael Holder, who, being by me duly sworn, deposed as follows:

1. "My name is James Michael Holder. I am of over 18 years old, of sound mind, and competent to make this affidavit.

2. I have read the special appearance of James Michael Holder, in his individual capacity and in his capacity as Vice President for Athletic Programs and Director of Intercollegiate Athletics for Oklahoma State University, and, subject thereto, his motion to dismiss based on a mandatory forum-selection clause, motion to stay, plea to the jurisdiction, and original answer. The factual matters stated therein are within my personal knowledge, or information obtained in the course of my regular duties, and are true and correct.

3. The documents attached to this special appearance as Exhibits A, B, and C are the original records or exact duplicates of the original records.

4. I am, and was at the time Exhibits A, B, and C were created, an employee of Oklahoma State University (OSU), and I have personal knowledge of the manner in which those records were prepared. Those 14 pages of documents are kept by OSU in the regular course of

- 11 -

its business. It was the regular course of business of OSU for an employee or representative of OSU—with knowledge of the act, event, condition, opinion, or diagnosis recorded—to make those documents or to transmit information to be included in those documents. Each document was made at or near the time of the act, event, condition, opinion, or diagnosis recorded, or reasonably soon thereafter. Each document was made by a person with knowledge of the act, event, condition, opinion, or diagnosis recorded, or by information transmitted by a person with such knowledge."

Further affiant sayeth not.

James Michael Holder

SWORN TO AND SUBSCRIBED before me on this _17th_ day of November, 2014.

My commission expires: 8/12/2016

NOTARY PUBLIC IN AND FOR THE
STATE OF OKLAHOMA

MARY E. HUFNAGEL
Notary's printed name

- 12 -

48

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was delivered on November 17, 2014, in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure, to the parties listed and in the manner indicated below:

David J. Beck
dbeck@beckredden.com
BECK REDDEN, LLP
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel. (713) 951-3700
Fax (713) 951-3720

Christopher R. Cowan
ccowan@beckredden.com
Karson K. Thompson
kthompson@beckredden.com
BECK REDDEN, LLP
515 Congress Avenue, Suite 1750
Austin, Texas 78701
Tel. (512) 708-1000
Fax (512) 708-1002

*Attorneys for Plaintiff Gregory Joe Wickline*

✓ Electronic service
☐ In person
☐ Registered mail, return receipt requested
☐ Commercial delivery service
☐ Facsimile
✓ Electronic mail



Sean E. Breen

- 13 -

49

## EMPLOYMENT CONTRACT

This Agreement, made by and between OKLAHOMA STATE UNIVERSITY, hereinafter referred to as the "University", and Gregory Joe Wickline, hereinafter referred to as "Coach";

WITNESSETH:

WHEREAS, University requires the services of an Assistant Coach for the University's Intercollegiate Football Team; and

WHEREAS, Gregory Joe Wickline meets the University's qualifications for the position and has been employed as such by University pursuant to an Employment Contract and Amendments thereto all of which the parties intend to cancel and replace by this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the University and the Coach agree as follows:

1. Subject to the conditions stated in the provisions of this agreement, the University hereby employs Coach as Assistant Coach for the University's Intercollegiate Football Team at Oklahoma State University for a designated period beginning with the 1st day of January, 2009 and ending on the first to occur of any of the following: (i) December 31, 2013; (ii) 180 days following the resignation of the Head Football Coach; or (iii) termination of this Contract as otherwise provided herein. The Coach hereby agrees to and does accept the terms and conditions for said employment for the designated period. Neither this Contract nor Coach's employment hereunder shall in any way grant the Coach a claim to tenure in employment, or any years of employment attributable to tenure within the University.

2. The compensation paid by the University to the Coach for services and satisfactory performance of the conditions of this Contract shall be at the annual salary rate of $157,500.00 per annum payable in monthly installments out of legally available funds by the University to the Coach on the last day of each calendar month during the term of this Contract. In addition, Coach shall

1

receive from legally available funds bonuses earned, if any, based on the performance incentives attained in the football season of the then current fiscal year in accordance with "Exhibit A" entitled "Financial Incentives," attached hereto and made a part hereof. It is agreed that the compensation so paid shall be subject to the same payroll deductions (for example, state and federal taxes, F.I.C.A. withholding, and retirement plans) that apply to University administrative and professional (A&P) employees. The Coach shall be eligible to participate in group insurance and retirement programs and voluntary payroll deduction programs on the same basis, and with the same employer contributions, that apply to University administrative and professional (A&P) employees.

3. The Coach shall devote his full time and attention to such duties and responsibilities as an Assistant Coach as assigned by and serving under the direction of the University's Head Football Coach. The Coach shall conduct such travel as is necessary to carry out his duties and the Coach shall be entitled to reimbursement for transportation and per diem expenses at the maximum rate authorized by law and University regulations.

4. The Coach shall recognize and comply with the policies, rules, and regulations of and governing Oklahoma State University and its employees and the rules of the Big Twelve Conference and the National Collegiate Athletic Association, as now constituted or as any of the same may be amended during the term hereof.

Coach shall respond, and shall not counsel or instruct any coach, student, or any other person to fail to respond, accurately and fully within a reasonable time to any reasonable request or inquiry relating to the performance of his duties hereunder or the performance of his duties during his prior employment at any other institution of higher learning propounded by University, NCAA, the Big Twelve Conference or other governing body having supervision over the athletic programs of University or such other institution of higher learning, or required by law, governing athletic rules or University policies and regulations.

Without limitation upon any right or remedy of the University in the event the Coach breaches this Contract, it is specifically agreed that if the

2

University finds after due hearing that the Coach is, has been, or was at any time, involved in violations of the NCAA legislation applicable to University or to any prior employer of the Coach which was at the time of such employment a member of NCAA, it may take one or more of the following actions that it deems appropriate: (1) termination of employment; (2) suspension, with or without pay, for a period of time as the University shall determine; (3) modification of duties; or (4) reassignment to other employment duties within the University.

Coach shall indemnify the University for all costs (including attorney fees) incurred by University in responding to any official inquiry of the NCAA resulting in a show cause penalty against the Coach by the Infractions Committee.

5.  Coach shall conduct himself with due regard to public convention and morals, shall not do any act that will tend to degrade him in society or bring him into public hatred, contempt, scorn, or ridicule, or that will tend to shock, or insult the community or offend public morals or decency, and he shall not do any act that tends to impair his capacity to fully comply with his obligations hereunder.

6.  Coach recognizes that University has assigned a high priority to the academic achievement of the students who participate in its athletic programs and that it is the expectation of the President and the Board of Regents that Coach will emphasize the importance of academic achievement to the students who are athletes at the University. Coach shall maintain a cooperative relationship with Academic Services for Student-Athletes in order to assure student-athletes are offered every opportunity to achieve academic expectations and success.

7.  Coach shall comply fully with all NCAA, Conference, and institutional regulations governing outside employment and compensation.

Any television, radio, consultant, endorsement, or outside employment agreement or contract of any nature as well as all other activities related to Coach's involvement in University athletics will be under the supervision, direction, and control of the Athletic Director. All such arrangements and activities must first be approved annually in writing by the Athletic Director and shall not conflict with the best interest of the University.

3

52

Coach must receive annually prior written approval from the President for all athletically related income and benefits from sources outside the institution, including but not limited to income from gifts to Coach from donors or from friends of the Athletic Department; annuities; sports camps; housing benefits (including preferential arrangements); country club memberships; complimentary ticket sales; television and radio programs; and endorsements or consultation contracts with athletics shoe, apparel, or equipment manufacturers.

It is specifically understood that Coach shall not use, directly or by implication, the name of the University or its logos in the endorsement of commercial products or services for personal gain without the prior written approval of the President.

8. The University reserves the right to either terminate this Contract, or to suspend the Coach for a period of time from performance of duties with or without pay without termination of this Contract for cause, including but not limited to any of the following : (1) the University has a reasonable basis for believing Coach has been involved in deliberate and significant or repetitive violations of Provision No. 4 of this Agreement, or (2) failure of Coach to comply with any of the provisions set forth in Provision Nos. 5 or 11 of this Agreement, or (3) any conduct of Coach in violation of any criminal statute (excluding minor traffic offenses) whether prosecuted or not, or any act of moral turpitude, or (4) violations by Coach of any of the other terms of this Agreement which cannot be or has not been remedied after thirty (30) days written notice thereof to Coach, or (5) conduct of Coach determined by the University to be seriously prejudicial to its best interests or the best interests of its athletic program, or (6) material misrepresentation of Coach's educational or other qualifications for employment as Coach hereunder, or (7) fraud or dishonesty of Coach in the performance of his duties or responsibilities under this Agreement, or (8) use or consumption by Coach of alcoholic beverages, drugs, controlled substances, steroids or other chemicals in such degree and for such appreciable period as to impair significantly or materially his ability to perform his duties hereunder or failure by Coach to fully cooperate in the enforcement and

4

implementation of any drug testing program established by University for student-athletes, or (9) any cause adequate to sustain the termination or suspension, as the case may be, of any other University employee.

The Head Football Coach or the Director of Intercollegiate Athletics shall have the administrative authority to order suspension of the Coach from duties and salary for causes identified in this Provision No. 8, provided, that notice of any such suspension shall be provided in writing, detailing the reasons for such suspension, and setting forth a reasonable time within which Coach may respond to same. The Coach shall have the procedural right, upon his written request, for a review and hearing relative to any such suspension. Any such hearing shall be governed by the normal University grievance procedures provided for administrative and professional (A&P) employees, as now or hereafter amended, unless other procedures are agreed upon by the parties in lieu thereof.

Termination of this Contract by the University may occur only after recommendation of such action by the Head Football Coach and approval thereof by the Director of Intercollegiate Athletics. If such adverse action is to be initiated for causes identified in this Provision No. 8, the Head Football Coach shall inform Coach in writing of his preliminary intent to recommend termination before making any such formal recommendation to the Director of Intercollegiate Athletics. In such case, the Head Football Coach will inform Coach in writing of specific concerns and provide Coach a meaningful opportunity to address the concerns of the Head Football Coach within a reasonable period of time (in no event less than fifteen (15) days) before proceeding with an adverse recommendation. Any other hearing which may be permitted shall be governed by the normal University grievance procedures provided for administrative and professional (A&P) employees, as now or hereafter amended unless other procedures are agreed upon by the parties in lieu thereof.

In the event this Contract is terminated by University for cause or causes under this Provision No. 8, University's sole liability to Coach shall be limited to payment of salary or installments thereof, which may have been earned and accrued before the end of the month of such termination.

5

54

9. Notwithstanding the term of duration of this Contract as stated in Paragraph One (1) hereof, and subject to the terms of Paragraphs Ten (10) and Eleven (11) hereof, either party may terminate this Contract without particular cause by giving written notice to the other party of the terminating party's exercise of this right to terminate. Such termination shall be effective immediately upon receipt of such written notice by the other party, unless specified otherwise in said written notice.

10. In the event University terminates this Contract without cause under Paragraph Nine (9) hereof, then Coach agrees to accept liquidated damages as specified in this Section 10 in complete satisfaction of and payment in full for all obligations, if any, due and owing by University to Coach. As liquidated damages, University shall pay Coach a sum equal to the sum of the gross base monthly salary in effect on the date of termination and remaining due under Section 2 of this Contract but for termination of the Contract, payable in equal monthly installments from legally available funds until the date on which the Contract would have expired, plus any bonuses (i.e., "Financial Incentives" as set forth in "Exhibit A") earned as of the date of termination. Coach shall be responsible for all taxes thereon. Coach shall be entitled to maintain health insurance coverage, at Coach's sole expense, as provided under law.

The parties have bargained for and agreed to this liquidated damages provision and have agreed that the payment of such liquidated damages shall constitute reasonable and adequate compensation for damages that might ensue as a result of University's termination of this Contract without cause, including any loss by Coach of any collateral business opportunities or any other benefits, perquisites or income from any other sources or agreements. Said liquidated damages shall not be construed as a penalty.

Notwithstanding the foregoing, a condition precedent to the University's obligations to pay the foregoing payments is that Coach diligently seek mitigation of this payment obligation by obtaining full-time employment, business or professional income (for example, but not limited to, football coaching, media commentator, speaking engagements, teaching or other academic activities,

6

consulting or participation in business or any other income producing opportunities). Coach shall begin and shall thereafter continue making very diligent efforts to obtain such income as soon as practicable but not later than thirty (30) days following such termination and each thirty (30) days thereafter shall provide University with a written report of the specific efforts undertaken in this regard including the amount of income, if any, resulting directly or indirectly therefrom. University's financial obligation under this Contract shall cease or be reduced commensurately by the amount of any such income.

11. The Coach agrees that he will not personally or, directly or indirectly, through any agent or representative, inquire into, seek, negotiate for, or accept other full-time or part-time employment of any nature at any time during the term of this Contract without first having obtained the written permission of the Head Football Coach and the Director of Intercollegiate Athletics, which permission shall not be unreasonably withheld.

The parties hereby agree that Coach has special, exceptional, and unique knowledge, skill, and ability as a football coach which, in addition to future acquisitions of coaching experience at the University, as well as the University's special need for continuity in its Intercollegiate Football Program, will render the Coach's services unique. The Coach recognizes that the loss of Coach's services to the University, without University approval and release, prior to the expiration of the term of this Contract or any renewal thereof, would cause an inherent loss to the University which cannot be estimated with certainty, or fairly or adequately compensated by money damages.

The Coach therefore agrees, and hereby specifically promises, not to accept employment, under any circumstances, as a football coach at any institution of higher education which is a member of the National Collegiate Athletic Association, or for any football team participating in any professional league or conference in the United States or elsewhere, requiring performance of duties prior to the expiration date of the term of this Contract or any extension thereof, without first obtaining a release of this Contract, or a negotiated settlement thereof in writing accepted by the Coach and the Director of

7

56

Intercollegiate Athletics and approved by the President of the University.

In the event of Coach's termination of this Contract without cause under Paragraph Nine (9) hereof prior to its expiration date without first obtaining a release therefrom by the University, Coach shall pay to University, as liquidated damages, a sum equal to fifty percent (50%) of the sum of the gross base monthly salary in effect on the date of termination and remaining due under Section 2 of this Contract but for termination of the Contract, said sum to become due and payable within thirty (30) days of the effective date of termination of the Contract, *provided, however,* University agrees to release Coach from his obligations under the Contract upon his request in order to enable him to assume employment as a Head Football Coach at a NCAA Division I-A institution and thereafter no liquidated damages shall be payable by Coach upon his termination of the Contract without cause. The parties have bargained for and agreed to the foregoing liquidated damages provision, giving consideration to the fact that University will incur administrative, recruiting, resettlement, and other costs in obtaining a replacement for Coach, in addition to potentially increased compensation costs if Coach terminates this Agreement prior to its expiration, which damages are extremely difficult or impracticable to determine with certainty. The payment of said sum shall constitute adequate and reasonable compensation to the University for the damages and injury suffered because of such termination by Coach. The foregoing shall not be, nor be construed to be, a penalty.

12. The Coach shall be entitled to annual vacation or leave time and sick leave in accordance with University policies governing administrative and professional (A&P) employees; except, however, no terminal vacation leave (i.e., accrued but unused annual leave) shall be due to or claimed by Coach upon termination or separation from University employment.

13. The University, as additional compensation to Coach, shall make arrangements for the provision to Coach on a loan basis an automobile for his use. It is further agreed that University shall provide and make available to Coach appropriate gasoline credit cards for Coach's use in the performance of his

8

57

duties with the University pursuant to this Contract, which cards shall be available to Coach throughout the term of this Contract. The University further agrees to provide appropriate liability and comprehensive automobile insurance to cover Coach in the use and operation of said vehicle, during the term of this Contract.

14. Any action to enforce any of the provisions of this Agreement shall be filed in the Payne County District Court. No such action may be filed until the party claiming to be aggrieved shall first have delivered to the other a written notice of intention to file suit, including an outline of complaints. This notice shall be delivered at least 30 days before any suit is filed, and the parties shall use that period to engage in good-faith negotiations aimed at resolving the dispute without litigation. This paragraph is not intended to limit or circumscribe the legal rights of any party thereto, but rather to ensure that the parties exhaust all avenues of seeking a mutually agreeable accommodation of their differences before instituting litigation. In any situation where the terms of this paragraph might affect the legal rights of any party hereto, the parties shall stipulate to appropriate extensions of limitation periods and other matters to eliminate any such potential effect.

15. It is understood and agreed that this Contract shall not be effective until signed by the President of Oklahoma State University, with the recommendation of its Head Football Coach and its Director of Intercollegiate Athletics, and that no amendments, alterations, or interpretations thereof shall be binding upon the University unless so made in writing and so approved by the President.

16. The relationship between the Coach and the University shall be determined solely by the terms and conditions of this Contract and this Contract supersedes and replaces all previous agreements between the parties and amendments thereto which are hereby cancelled by mutual consent.

17. This Contract has been entered into under and shall be governed by the laws of the State of Oklahoma and any provision of this Contract prohibited by the laws of said State shall be ineffective to the extent of such prohibition

9

58

without invalidating the remaining provisions of this Contract.

18. This Contract may be amended by mutual agreement executed in writing and appended hereto. It is contemplated that any adjustments in compensation paid the Coach that may be agreed upon will be accomplished in the same manner and on the same forms as are utilized by the University for other Athletic Department and University employees.

DATED as of the 1st day of January, 2009.

Recommended:

_____
Michael R. Gundy
Head Football Coach

_____
Mike Holder, Vice President for
Athletic Programs and Director
of Intercollegiate Athletics

COACH

_____
Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

By:_____
V. Burns Hargis
President

10

# Financial Incentives

## Overall Performance Incentives

| Category | Base Amount |
| --- | --- |

### Championship
| | |
| --- | --- |
| National Championship | $20,000.00 |
| Big 12 Championship | $10,000.00 |
| Big 12 South Championship | $ 5,000.00 |

### Final National Ranking – CNN/USA Today Poll
| | |
| --- | --- |
| Top 10 | $5,000.00 |
| 11-15 | $3,000.00 |
| 16-25 | $2,000.00 |

### Post Season Bowl Game Participation*
| | |
| --- | --- |
| BCS Bowl | Up to 2 months University salary as determined by the Athletic Director |
| All Others | Up to 1 month University salary as determined by the Athletic Director |

*Post Season Bowl Incentive payments shall not be earned by or payable to Coach if he voluntarily leaves the employment of the University and/or terminates this Contract without cause prior to the official date for signing of the National Letter of Intent for the sport of football following the Bowl appearance.

The incentives will be paid according to the highest level achieved in each category. Thus, only one payment per category is applicable. *The decision of the Athletic Director shall be final as to any interpretations or disputes pertaining to these financial incentives.*

Exhibit A

60

# FIRST AMENDMENT
## TO
## EMPLOYMENT CONTRACT

This First Amendment is hereby entered into effective this 1st day of January 2011 to that certain Employment Contract dated January 1, 2009, between Oklahoma State University and Gregory Joe Wickline.

IN CONSIDERATION of the performance of the covenants and conditions contained herein and in the said Employment Contract dated January 1, 2009, the parties hereto agree that said Employment Contract is hereby amended in the following respects only:

- The annual salary set forth in Paragraph Two (2) is hereby increased to $200,000.00 beginning January 1, 2011;
- Paragraph 1.(ii) is modified to read as follows "one year following the resignation of the Head Football Coach; or";
- In Section 11 the referenced percentage for calculating liquidated damages payable by Coach to University shall be increased to seventy-five percent (75%);
- That in addition to employment as a Head Football Coach, Coach shall also be released from the obligation to pay liquidated damages upon assumption of employment as an Offensive Coordinator (with play calling duties) at a NCAA Division I-A institution or as an Assistant Coach in the NFL; and
- "Exhibit A" entitled "Financial Incentives" attached to said Contract is hereby deleted and the attached "Amended Exhibit A" is substituted therefor.

It is expressly agreed that this Amendment is supplemental to the original Employment Contract of January 1, 2009, which is made a part hereof by reference, and all terms, conditions, and provisions of said original Contract, unless specifically modified hereby, are made a part hereof as though expressly incorporated and included herein.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the date and year first above written.

Recommended:

_____
Michael R. Gundy
Head Football Coach


_____
Mike Holder, Vice President for
Athletic Programs and Director of
Intercollegiate Athletics

COACH

_____
Gregory Joe Wickline


OKLAHOMA STATE UNIVERSITY

By: _____
V. Burns Hargis
President

61

## Overall Performance Incentives

| Category | Base Amount |
| --- | --- |

### Championship

| | |
| --- | --- |
| National Championship | $20,000.00 |
| Big 12 Championship | $10,000.00 |
| Big 12 South Championship | $ 5,000.00 |

### Final National Ranking – CNN/USA Today Poll

| | |
| --- | --- |
| Top 10 | $5,000.00 |
| 11-15 | $3,000.00 |
| 16-25 | $2,000.00 |

### Post Season Bowl Game Participation

| | |
| --- | --- |
| BCS Bowl | Up to 2 months total compensation (salary plus talent) as determined by the Athletic Director |
| All Others | Up to 1 month total compensation (salary plus talent) as determined by the Athletic Director |

The incentive payments shall be made in January according to the highest level achieved in each category. Thus, only one payment per category is applicable. The decision of the Athletic Director shall be final as to any interpretations or disputes pertaining to these financial incentives.

# SECOND AMENDMENT
## TO
## EMPLOYMENT CONTRACT

This Second Amendment is hereby entered into effective this 1st day of January, 2012, to that certain Employment Contract dated January 1, 2009, between Oklahoma State University and Gregory Joe Wickline.

IN CONSIDERATION of the performance of the covenants and conditions contained herein and in the said Employment Contract dated January 1, 2009, as subsequently amended by a First Amendment thereto, the parties hereto agree that said Employment Contract is hereby amended in the following respects only:

- The date set forth in Paragraph 1.(i) of said Employment Contract is changed to December 31, 2016; and

- Subject to the exceptions allowing release in Section 11, the referenced percentage for calculating liquidated damages payable by Coach to University shall be one hundred percent (100%) in the event Coach accepts employment by a member institution of the Big Twelve Conference.

It is expressly agreed that this Second Amendment is supplemental to the original Employment Contract of January 1, 2009, and First Amendment thereto, which are made a part hereof by reference, and all terms, conditions, and provisions of said original Contract, and First Amendment thereto, unless specifically modified hereby, are made a part hereof as though expressly incorporated and included herein.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment on the date and year first above written.

Recommended:

_____
Michael R. Gundy
Head Football Coach

_____
Mike Holder, Vice President for
Athletic Programs and Director of
Intercollegiate Athletics

COACH

_____
Gregory Joe Wickline

OKLAHOMA STATE UNIVERSITY

By: _____
V. Burns Hargis
President